1  DENNIS P. RIORDAN, Esq. (SBN 69320)
   DONALD M. HORGAN, Esq. (SBN 121547)
2  RIORDAN & HORGAN
   523 Octavia Street
3  San Francisco, CA 94102
   Telephone: (415) 431-3472
4
5  Attorneys for Petitioner
   EDDIE COLE
6
7
8
                **IN THE UNITED STATES DISTRICT COURT**
9
              **FOR THE NORTHERN DISTRICT OF CALIFORNIA**
10
11  EDDIE COLE,                          )    No.  C 07 5183
                                         )
12         Petitioner,                   )
                                         )
13              v.                       )
                                         )
14  TOM FELKER, Warden of the High       )
    Desert State Prison,                 )
15                                       )
           Respondent.                   )
16  _____     )

17
18              **MEMORANDUM IN SUPPORT OF VERIFIED**
19                **PETITION FOR WRIT OF HABEAS CORPUS**

20
21
22
23
24
25
26
27
28
    **Memorandum in Support of**
    **Petition for Writ of Habeas Corpus**

1

**TABLE OF CONTENTS**

2  INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -1-

3  STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -2-

4  STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -4-

5    A.    The Prosecution Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -4-

6          1.    Testimony of Percipient Witness David Pugh . . . . . . . . . . . . . . . . . . . -4-

7          2.    Testimony of Percipient Witness Roderick Estrada  . . . . . . . . . . . . .    -7-

8          3.    Testimony of Percipient Witness Trina McQueen  . . . . . . . . . . . . . . . -8-

9          4.    Testimony of Officer Gregory Watts Concerning Police
10               Response to Shooting . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -11-

11         5.    Testimony of Inspector Raymond Gee Concerning Physical
                 Evidence  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -12-

12         6.    Testimony of Parking Lot Attendant Egbert Galindo  . . . . . . . . . . . . -12-

13         7.    Testimony of Coroner Boyd Stephens . . . . . . . . . . . . . . . . . . . . . . . . . -13-

14         8.    Further Police Testimony Concerning Petitioner's Arrest  . . . . . . . . . -14-

15         9.    Inspector Spillane's Testimony Concerning Custody
16               of Petitioner's Jacket  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -15-

17         10.   Police Testimony Concerning Gunshot Residue on Jacket    . . . . . . . -16-

     B.    The Defense Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -16-
18
19         1.    Testimony of Percipient Witness Matthew Bell    . . . . . . . . . . . . . . . -16-

20         2.    Additional Testimony Concerning Custody of Petitioner's
                 Jacket   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -18-

21         3.    Additional Defense Evidence Concerning Carl Young,
                 Trina McQueen, and Gunshot Residue  . . . . . . . . . . . . . . . . . . . . . . . . -19-
22
23  ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -20-

     I.    PETITIONER IS ENTITLED TO HABEAS RELIEF BECAUSE THE STATE
24         COURTS UNREASONABLY DISPOSED OF HIS FEDERAL CONSTITUTIONAL
           CLAIMS CHALLENGING THE TRIAL COURT'S REFUSAL TO READ HIS
25         PROFFERED INSTRUCTIONS ON ACTUAL AND IMPERFECT
           SELF-DEFENSE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -20-
26
27         A.    Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -20-

28

B.    Statement of Facts  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  -21-

    1.    Evidence Supporting the Conclusion that Petitioner Shot the
        Victim in Actual or Imperfect Self-Defense  . . . . . . . . . . . . . . . . . . .  -21-

    2.    The Trial Court's Refusal of Proffered Defense Instructions on
        Complete and Imperfect Self-Defense . . . . . . . . . . . . . . . . . . . . . . . .  -22-

C.    Clearly Established Constitutional Precedent Holds That a Trial Court
    Must Instruct on Self-Defense in a Homicide Case Where the Defendant
    Seeks to Rely on That Defense and the Evidence Would Permit a Finding
    That It Applies  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  -24-

D.    The Trial Court Unreasonably Determined That The Evidence Did Not
    Support Instructions On Complete and Imperfect Self-Defense  . . . . . . . . . . .  -27-

E.    The Court of Appeal Unreasonably Rejected Petitioner's
    Claims on Appeal  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  -29-

F.    The Trial Court's Unreasonable Refusals to Instruct on Complete
    Self Defense and Imperfect Self Defense Were Prejudicial Within
    the Meaning of *Brecht* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  -32-

CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  -34-

# TABLE OF AUTHORITIES

## CASES

*Brecht v. Abrahamson*,
507 U.S. 619 (1993)                                    2, 20, 32

*California v. Roy*,
519 U.S. 2 (1997)                                           20

*Cargle v. Mullin*,
317 F.3d 1196 (10th Cir.2003)                               32

*In Re Christian S.*,
7 Cal. 4th 574 (1994)                                       26

*Crane v. Kentucky*,
476 U.S. 683 (1986)                                         25

*Duhaime v. Ducharme*,
200 F.3d 597 (9th Cir.2000)                                 20

*Estelle v. McGuire*,
502 U.S. 62 (1991)                                          24

*Fiore v. White*,
531 U.S. 225 (2001)                                         24

*Holmes v. South Carolina*,
___ U.S. ___, 126 S. Ct. 1727 (2006)                        25

*Keating v. Hood*,
191 F.3d 1053 (9th Cir. 1999)                               25

*Kotteakos v. United States*,
328 U.S. 750 (1946)                                         32

*Kyles v. Whitley*,
514 U.S. 419 (1995)                                         32

*Mancuso v. Olivarez*,
292 F.3d 939 (9th Cir. 2002)                                20

*Mathews v. United States*,
485 U.S. 58 (1988)                                          25

*Mullaney v. Wilbur*,
421 U.S. 684 (1975)                                       26, 27

*Osborne v. Ohio*,
495 U.S. 103 (1990)                                         25

*People v. Anderson*,
144 Cal. App. 3d 55 (1983)                              27, 30, 31

**Table of Authorities continued**

*People v. Breverman,*
19 Cal. 4th 142 (1998) .......................................... 26, 28, 30

*People v. Castillo,*
193 Cal. App. 3d 119 (1987) .......................................... 27, 31

*People v. Dawson,*
88 Cal. App. 2d 85 (1948) .......................................... 25

*People v. De Leon,*
10 Cal. App. 4th 815 (1992) .......................................... 27, 30

*People v. Elize*
71 Cal. App. 4th 605 (1999) .......................................... 26, 28, 30

*People v. Flannel,*
25 Cal. 3d 668 (1979) .......................................... 26

*People v. Humphrey,*
13 Cal. 4th 1073 (1996) .......................................... 25, 27

*People v. Mayberry,*
15 Cal. 3d 143 (1975) .......................................... 30

*People v. Pineiro,*
129 Cal. App. 3d 915 (1982) .......................................... 27

*People v. Rios,*
23 Cal. 4th 450 (2000) .......................................... 27

*Sandstrom v. Montana,*
442 U.S. 510 (1979) .......................................... 25

*Stevenson v. United States,*
162 U.S. 313 (1896) .......................................... 25

*Sullivan v. Louisiana,*
508 U.S. 275 (1993) .......................................... 24

*United States v. Gaudin,*
515 U.S. 506, 509-10 (1995) .......................................... 25

*United States v. Kessee,*
992 F.2d 1001 (9th Cir. 1993) .......................................... 30

*United States v. Lopez,*
514  U.S. 549 (1995) .......................................... 32

*Williams v. Taylor,*
529 U.S. 362 (2000) .......................................... 20

*Ylst v. Nuuemaker,*
501 U.S. 803-04 (1991) .......................................... 20

DENNIS P. RIORDAN, Esq. (SBN 69320)
DONALD M. HORGAN, Esq. (SBN 121547)
RIORDAN & HORGAN
523 Octavia Street
San Francisco, CA 94102
Telephone: (415) 431-3472

Attorneys for Petitioner
EDDIE COLE

## IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| EDDIE COLE, | No.  C 07 5183 |
| Petitioner, | **MEMORANDUM IN SUPPORT OF VERIFIED PETITION FOR A WRIT OF HABEAS CORPUS** |
| v. | |
| TOM FELKER, Warden of the High Desert State Prison, | |
| Respondent. | |

## INTRODUCTION

Following a jury trial in the San Francisco Superior Court, petitioner Eddie Cole was found guilty of second degree murder in connection with his fatal shooting of Carl Young at the conclusion of a street fight in San Francisco in May, 2003.

The jury heard substantial evidence that Mr. Young had struck Mr. Cole in the face during the fight; that the two had exchanged hostile words; that Mr. Young had walked away from the fight, but that as he did so, threatened to "take it to gunplay"; and that Mr. Young appeared to be reaching for something before the fatal shot was fired.  Based on this and other evidence, Mr. Cole's counsel sought instructions informing jurors that if Cole had acted in "actual" self-defense, i.e., on an actual and reasonable belief in the need to defend himself, his conduct was justifiable. Alternatively, Mr. Cole sought instructions on "imperfect" self-defense, which explained that if he had acted in an actual but unreasonable belief in the need to defend

1  himself, his crime could be no more than manslaughter.

2      Mr. Cole did not testify. Persuaded by the erroneous belief that his testimony was

3  required to establish the evidentiary foundation for the requested self-defense instructions, the

4  trial court refused to read any of them. That erroneous ruling stripped petitioner of his federal

5  constitutional rights to have the government prove all elements of the offense to a jury, and to

6  present a meaningful defense to the charges against him.

7      On the basis of the second degree murder conviction and a related enhancement for

8  intentional gun use, the trial court sentenced Mr. Cole to a term of 40 years to life in prison. He

9  subsequently advanced his federal constitutional claims before the state court of appeal, but that

10  court affirmed the judgment against him. The state supreme court later declined to review the

11  appellate court's disposition.

12      The trial court's instructional ruling was flatly erroneous under governing federal

13  constitutional precedent. The state appellate courts' disposition of petitioner's federal

14  constitutional claims, moreover, constituted both an unreasonable construction and application of

15  such precedent as well as an unreasonable construction of the facts within the meaning of

16  AEDPA (28 U.S.C. section 2254(d)(1) and (2)). Finally, the trial court's error was prejudicial

17  under the standard set forth in *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) because it is

18  reasonably probable that the jurors would have returned a different verdict had the proposed

19  instructions been read. Habeas relief is accordingly in order.

20                  **STATEMENT OF THE CASE**

21      On May 13, 2003, a complaint was filed in San Francisco Superior Court, alleging that on

22  May 7, 2003 petitioner committed the first degree murder of Karl Young, in violation of Penal

23  Code (hereinafter "PC") section 187, a serious felony within the meaning of PC section

24  1192.7(c)(1). (CT 2)[1] The complaint alleged that in the commission of the murder, petitioner

25  personally used a firearm, within the meaning of PC sections 12022.5(a)(1) and 12022.53(b).

26  (Ibid.) The complaint additionally contained two special allegations: that petitioner personally

27

28      [1] "CT" refers to the Clerk's Transcript and "RT" to the Reporter's Transcript, each as so designated for purposes of petitioner's state court appeal.

**Memorandum in Support of**
**Petition for Writ of Habeas Corpus**      -2-

1  and intentionally discharged a firearm, within the meaning of PC sections 12022.53(c) and

2  12022.53(e)(1); and that, in commission of the charged offense, petitioner personally and

3  intentionally discharged a firearm, thereby causing the death of Carl Young, within the meaning

4  of PC section 12022.53(d). (CT 2-3) A second felony count alleged that on May 7, 2003

5  petitioner violated PC section 12021(a)(1) by possessing a firearm, having previously been

6  convicted, on December 4, 2002, of felonious violation of Health and Safety Code (hereinafter

7  "HS") section 11359 (possession of marijuana for sale). (CT 3)

8      On May 13, 2003, petitioner was arraigned in San Francisco Superior Court, and, on May

9  15, 2003, he entered a plea of not guilty on both counts. (CT 4)

10     On July 15, 2003, at the preliminary hearing, petitioner was bound over on both counts.

11  (CT 9)

12     On July 28, 2003, an information was filed in San Francisco Superior Court, repeating all

13  the allegations of the initial complaint. (CT 11-12)

14     After several continuances, trial by jury was calendared for April 5, 2004. (CT 71) On

15  that date, pursuant to an in limine motion by the People, two allegations under Count One, those

16  under PC sections 12022.53(b) and 12022.53(c), were stricken. (RT 5) On that same date,

17  petitioner waived his right to jury trial on the PC section 12021(a)(1) violation alleged as Count

18  Two, and stipulated to a prior violation of HS section 11359 (possession of marijuana for sale),

19  on December 4, 2002, in San Francisco. (RT 5-7)

20     Jury selection began on April 7, 2004, and was completed on April 8, 2004. (CT 75-76)

21  Trial began on April 12, 2004. (CT 81) Deliberations began on April 15, 2004, at 2:55 PM. (CT

22  148) At 4:15 PM on that same day, the jury requested a readback of the testimony of two

23  prosecution witnesses and related matters. (CT 148, 220; RT 524-525) The jury resumed

24  deliberations on April 19, 2004. (CT 221) During continuing deliberations on April 20, 2004, the

25  jury made three additional requests for various portions of prosecution witness testimony. (CT

26  222-225)

27     On April 21, 2004, the jury informed the court that they could not agree on a verdict on

28  the charge of first degree murder, and requested further instructions from the court. (CT 226)

**Memorandum in Support of**
**Petition for Writ of Habeas Corpus**           -3-

1  Later on that same date, at 4:27 p.m. the jury returned its verdict, finding, on Count One, that

2  petitioner was not guilty of first degree murder, but was guilty of the lesser and included offense

3  of second degree murder, in violation of PC section 187. (CT 227-230, 232) The jury also found

4  true the allegations that petitioner personally used a firearm, and personally and intentionally

5  discharged the firearm, causing death to Karl Young, within the meaning of PC sections

6  12022.5(a)(1), and 12022.53(d), respectively. (Ibid.) The jury also found petitioner guilty, on

7  Count Two, of possessing a firearm, in violation of PC section 12021(a)(1), having previously

8  been convicted of a felony. (CT 231-232)

9        On May 26, 2004, petitioner was sentenced to 15 years to life on Count One, and to an

10  additional term of 25 years, to be served consecutively, on the PC section 12022.53(d)

11  enhancement. (CT 238)  An additional term of 3 years, on the PC section 12022.5(a)(1)

12  enhancement, was stayed. (Ibid.) Petitioner was also sentenced to a term of 3 years on Count

13  Two, to be served concurrently. (CT 239-240)

14        Petitioner filed a timely notice of appeal on June 23, 2004. (CT 262) The California Court

15  of Appeal, First Appellate District, Division Five, affirmed the judgment and sentence in an

16  opinion issued on April 21, 2006.  (See Exh. A to Petition for Habeas Corpus filed on October 9,

17  2007).  Petitioner thereafter filed a timely petition for review in the California Supreme Court.

18  That Court denied the petition in an order issued on July 12, 2006.  (Exh. B to October 9, 2007

19  Petition)

20        Petitioner filed a timely Verified Petition for a Writ of Habeas Corpus in this Court on

21  October 9, 2007.  He submits the instant memorandum of points and authorities in support of

22  that Petition.

23                          **STATEMENT OF FACTS**

24  **A.     The Prosecution Case**

25           **1.     Testimony of Percipient Witness David Pugh**

26        On May 7, 2003, David Pugh, a crack cocaine dealer from Oakland, rode the BART to

27  San Francisco with an associate named "T." (RT 191-192) They arrived at the Powell Street

28  station at about 7:30 or 8:00 PM, and began walking toward the Tenderloin District to join other

**Memorandum in Support of**
**Petition for Writ of Habeas Corpus**              -4-

1   associates of theirs from Oakland for a night of selling drugs. (RT 192) As they made their way

2   through the streets, several people they met along the way told Pugh that two of his associates

3   from Oakland had been "jumped" at a street corner. (RT 191-194) One was a man named

4   "Tone," and the other was Karl Young (also known as "YB" or "Young Blood"), one of Pugh's

5   best friends, with whom he sold crack cocaine in the Tenderloin. (RT 191, 193, 209-210, 223)

6       Pugh and "T" headed for the corner of Taylor and Turk Streets, looking for Tone and

7   Young. (RT 194) When they came upon Tone, Pugh saw that his face was swollen. (RT 194)

8   After they found Young, they all headed down Taylor to its intersection with Market Street at

9   Sixth Street, looking for the people who had jumped Young and Tone, in order to fight with

10  them. (RT 195-196)

11      When they reached the area of Sixth and Market, their group numbered 8 to 10 people.

12  (RT 211) At the northeast corner of 6th and Market, Young, who stood 5'10" and weighed 228

13  pounds, saw the person who had jumped him, Matthew Bell (also known as "Mellow"), whom

14  Pugh did not know, but whom he described as a short, dark-skinned man with a bald head. (RT

15  54, 196-197, 387) Bell was part of a group of 4 or 5 people. (RT 212)

16      Pugh testified that they started fighting with Bell, and continued for a couple of minutes.

17  (RT 197-198) During the altercation, Pugh and Young, fighting side-by-side, were among three

18  or four people beating up Bell at the same time. (RT 212, 216) When the fight ended, Pugh and

19  Young stood in one group with their friends, Bell stood in a separate group with his friends, and

20  the two groups exchanged angry words with each other. (RT 198) Bell told Pugh and Young that

21  they didn't have to jump them. (RT 198) Young replied, "Y'all jumped me." (RT 198)  Then

22  Young began to walk away, saying, "You guys jumped me and we jumped y'all, so we can leave

23  it at that or we can take it to gunplay, whatever." (RT 198)

24      At some point Pugh noticed someone in the crowd who had walked up from Golden Gate

25  Street after the fight ended, but before the final exchange of words. (RT 198-199) This person

26  was taller than Pugh (who is 5'11"), slender, brown-skinned, and had long hair. (RT 197-199)

27  Pugh did not observe anything in the man's hands. (RT 199)

28                                    / /

**Memorandum in Support of**
**Petition for Writ of Habeas Corpus**              -5-

1      Pugh started walking away down the street, and Young turned his back and started
2   walking away across Market Street, crossing from the northeast toward the southeast corner. (RT
3   200) Pugh heard someone yell, "He has a gun." (Ibid.)  Pugh turned and saw the man who had
4   come from Golden Gate now standing in a group of five or six people, and pointing a handgun at
5   Young. (RT 200, 215-216) Young, too, turned to see who had the gun, then started running
6   across the street. (RT 201) Two or three shots were fired. (Ibid.) Young stumbled at a Muni
7   traffic island, about 10 feet from the northeast corner of the intersection, regained his footing, ran
8   to the southeast corner, and then fell to the ground. (RT 87-88, 201) Pugh ran over to him, and
9   told him to get up, but Young did not do so. (RT 201)

10      While Young lay on the ground, Pugh held him in his arms. (RT 215) As a large number
11   of people gathered around them, he searched Young, going through his pockets. (RT 217) He
12   testified that he did not find a gun, and that when Young had said, "If you want to take it to
13   gunplay, that's fine," Young had not been armed.  (RT 215, 217)

14      Pugh testified at trial that before the shooting, when he had looked for the man with the
15   gun, he did not particularly notice the clothes the man was wearing, and could not remember
16   anything particular about his face, but that he had seen him in the area previously, "maybe once
17   or twice." (RT 202) He testified, however, that he did remember that the man with the gun was
18   wearing a blue and red jersey. (RT 219)

19      When Young was taken by ambulance to SF General Hospital, Pugh followed him,
20   driving Young's car. (RT 202) He was interviewed at the hospital by two homicide detectives.
21   (RT 202-203) Because there was a warrant for his arrest at that time, Pugh told the detectives that
22   his name was "Damon Smith."  (RT 204) At some point during his statement to police, Pugh told
23   them that he needed to use the bathroom, and when they allowed him to do so, he fled from the
24   hospital. (RT 205-206) The homicide detectives did not catch up with him until a later date,
25   when he was in custody on another matter.  (RT 206) He was shown a six-person photo spread at
26   that time, and identified petitioner as the shooter.  (RT 206-208) He also identified petitioner in
27   court.  (RT 202)

28                                    / /

1    Pugh acknowledged that he and Young both owned guns, but testified that neither of
2    them had their guns with them on that day. (RT 195-196, 210)

3    Pugh had prior felony convictions for possession of narcotics for sale in 1996, and for
4    sales of crack cocaine in 2000. (RT 205, 209) At the time the shooting took place, Pugh was also
5    on felony probation in Alameda County for sale of crack cocaine. (RT 209)  When Pugh was
6    interviewed by homicide detectives the second time while in custody in San Francisco, he was
7    still on probation from Alameda County. (RT 226) At the time he testified, he was in custody in
8    Santa Rita, in Alameda County, for a probation violation. (RT 205) He also had a bench warrant
9    in San Francisco for possession of cocaine. (RT 205, 227) He testified that he was expecting to
10    receive some type of diversion and avoid prison in the San Francisco matter, but that he was
11    receiving no benefit in exchange for his testimony. (RT 205, 227-228)

12                              **2.    Testimony of Percipient Witness Roderick
                                        Estrada**

13
14    Roderick Estrada witnessed the shooting from outside a building near the southeast
      corner of Sixth and Market, where he worked as a security guard. (RT 149, 152)  At about 8:50
15
      PM, he heard yelling sounds, and when he looked outside, he saw a group of 15 to 20 people
16
      coming around the corner from Taylor Street to the northeast intersection of Sixth and Market.
17
      (RT 151-152, 165, 168)
18
      Estrada saw one person take off his coat, and he heard him yell cuss words. (RT 153) He
19
      saw him walk away, and then walk back to the group, but he did not see any blows struck. (Ibid.)
20
      As the group began to scatter in various directions, he noticed a slim African- American
21
      male, about six-feet or six-feet-one, standing with a gun in his hand. (RT 153-154) The man was
22
      wearing dark jeans, a white or light-color shirt, and a blue-and-white leather-type jacket. (RT
23
      154) On the back of the jacket was a logo of some sort, with a white spot in the middle. (RT 155)
24
      The man wore a beanie on his head, with tassels hanging down on both sides. (RT 154)
25
      Estrada saw the man walk toward the corner and fire the weapon, and he saw someone
26
      run away from the shooter into the middle of the intersection. (RT 155) He heard 3 or 4 shots
27
      fired. (RT 156) The victim started to stumble as he neared the middle of the intersection, then
28

**Memorandum in Support of**
**Petition for Writ of Habeas Corpus**          -7-

1  changed his direction and headed for the southeast corner, where he fell to the ground. (RT 157)

2  Estrada looked briefly back and forth between the victim and the shooter during the incident.

3  (RT 167)

4  　　　　As Estrada moved toward the victim, he watched the shooter head away toward Taylor, in

5  a group with four or five other people. (RT 157-158, 175) When the shooter reached the corner

6  of Taylor, Estrada lost sight of him. (RT 158) Estrada assumed the shooter continued up Taylor,

7  and focused his attention on the victim on the ground. (RT 158) Estrada did not see the shooter

8  run up Golden Gate. (RT 172)

9  　　　　Estrada reached a spot about 10 to 15 feet from the victim within about 5 seconds after

10 the victim fell to the ground. (RT 173-174) People were gathering around the victim, including

11 one male who sat beside him, telling him to hang on, and telling everyone else not to touch the

12 victim. (RT 158-159) Estrada called 911 on his cordless phone. (RT 159, 173)

13 　　　　Estrada was shown a photo spread later that evening. (RT 162) He selected three of the

14 six photos as possibly resembling the shooter, but stated that the two photos on the bottom row

15 looked more like the shooter than did the photo in the upper row, which was the photo of

16 petitioner. (RT 162-163, 177)

17 　　　　Estrada told the police that he didn't get a very good look at the shooter's face, but that he

18 did get a good look at the shooter's jacket, and he made a contemporaneous drawing of it for

19 them. (RT 169) The body of the jacket was blue, and the sleeves were white. (RT 169-170) The

20 jacket came only to just below the level of the shooter's waist. (RT 176) A blue-and-white jacket

21 such as the shooter was wearing was unusual to see; he had never before seen anyone wearing

22 another jacket like it in that part of San Francisco. (RT 172-173)

23 　　　　Estrada was unable to identify petitioner in the courtroom.  (RT 163)

24 　　　　　　　**3.    Testimony of Percipient Witness Trina McQueen**

25 　　　　Trina McQueen had been at the corner of Sixth and Market all day, using and selling

26 crack cocaine the entire time, and staying high continuously. (RT 236-237, 244-245) She

27 testified, however, that at the time of the shooting, she had not been under the influence of crack

28 cocaine for at least an hour. (RT 262)

**Memorandum in Support of**
**Petition for Writ of Habeas Corpus**　　　　　-8-

1       McQueen testified she saw the fight break out between Young and Bell in front of Ariks

2  on the northeast corner of Sixth and Market. (RT 238, 253) She was about five or six feet away.

3  (RT 253-254) She recognized Young, who was one of her suppliers of crack cocaine. (RT 247)

4  She had known him for about four years, mostly in the vicinity of Sixth and Market, which he

5  frequented except when he was in jail. (RT 246) McQueen also recognized Bell, whom she knew

6  as "Mellow," and whom she had known for about 2-1/2 years. (RT 247-248) Bell also frequented

7  the area at Sixth and Market, and McQueen had seen him hanging out there all that day. (RT

8  247-249) Before the fighting broke out, she heard Young confront Bell, saying, "Why you all

9  jumping my friends?" (RT 250-251) Young began fighting with Bell, and then about four of

10  Young's friends joined in. (RT 249, 253) McQueen testified that Bell had won the fight against

11  the five people, saying that Mellow "kicked their ass.... They didn't beat Mellow up. Mellow

12  kick[ed] their ass." (RT 252-253) (RT 254) She testified that the crowd around them at the time

13  numbered over a hundred people. (RT 250)

14       When the fight ended, Young and his four associates stood in the street in front of Ariks,

15  off the curb, and Bell remained on the curb. (RT 254) There were still a lot of people around,

16  spread out in the area. (Ibid.) A friend of Bell's came over to him and pulled him away, and they

17  began heading toward Taylor Street. (RT 254-255)

18       By now, McQueen was watching from the corner of Taylor and Golden Gate. (RT 255)

19  She saw a tall man wearing light-colored blue jeans take a gun from the right hip pocket of a very

20  expensive-looking blue-and-white jacket that he was wearing, which had "a lot of writing" on the

21  back. (RT 239-240, 256-257) The blue portion of the jacket was "sky blue" or "royal blue." (RT

22  257-258) McQueen stated that the arms were white, and perhaps blue as well. (RT 257) The body

23  was both blue and white. (Ibid.) Unlike others in the area, the man had "cornrows" or "French

24  braids" in his hair, tight to the scalp and in rows, with no tassels hanging down. (RT 239-240,

25  258-59)

26       McQueen testified that she was one of perhaps four or five people who were standing

27  within three or four feet of the shooter, but that she didn't see what he did with the gun. (RT 240,

28  259) McQueen testified that the shooter, whom she described as "tall," was between 5'7" and 5'9"

1  in height. (RT 256) Once the first shot was fired, many of the other 100 or so people scattered

2  and ran in various directions. (RT 260) Since she was facing down 6th Street, she didn't see the

3  people who might have run up Taylor or Golden Gate. (RT 260)

4       When Young was shot and went down to the ground, McQueen ran across Market Street,

5  went over to him, and told him it was going to be okay. (RT 240, 260) She testified that she

6  stayed with Young "a matter of three seconds...maybe," and, after she told him that he would be

7  okay, she turned to her right. (RT 261) It was then that she saw the shooter going up Golden

8  Gate. (RT 261) She testified that she could not say whether he was walking or running, and

9  whether he was alone or was with other people. (RT 262) She could only be sure that he "had on

10 a white jacket." (RT 262)

11      She testified that at this point she was watching both Young and the shooter. (RT 240)

12 She watched as the shooter went up Golden Gate. (RT 241) Then she herself went up Golden

13 Gate. (RT 241) She lost sight of the shooter in the vicinity of a parking lot on Golden Gate. (RT

14 241) She remained where she was, and then she saw the shooter drive out of the parking lot in a

15 burgundy Mazda. (RT 242) She saw the license plate and memorized it. (RT 242) When the car

16 came out of the parking lot, there was also a passenger inside. (RT 263)

17      McQueen ran back to where Young lay, and told him again that it was going to be okay.

18 (RT 242) She began screaming, and an officer put her in a police car and took her to a police

19 station, where she was kept for five hours, during which time she talked with police inspectors.

20 (Ibid.) She testified that she had not given her information to anyone at the scene. (Ibid.)

21      McQueen acknowledged that the defense attorney and an investigator interviewed her

22 when she was in jail on October 8, 2003, but she testified she only remembered having said that

23 she did not want to talk to anyone. (RT 264-266) During the defense case, however, the defense

24 investigator reported that during the interview, McQueen stated she had been stoned on crack on

25 the evening of May 7, 2003, and didn't see anything. (RT 364-365)

26      At some point, McQueen was shown a six-person photo spread, and identified petitioner

27 as the shooter. (RT 243-244) She also identified petitioner in court as the person she had selected

28 from the photo spread. (RT 267)

**Memorandum in Support of**
**Petition for Writ of Habeas Corpus**          -10-

### 4.    Testimony of Officer Gregory Watts Concerning Police Response to Shooting

Within minutes after the shooting, Police Officer Gregory Watts arrived at the scene and parked his vehicle in the intersection, about 20 feet from where Young was lying in the street near the southeast corner. (RT 100-101, 114-115) Young, an African-American male, was lying face down, and did not appear to be breathing. (RT 102) A crowd of 20 to 30 people was in the immediate area, some gathered around Young. (RT 115) Most were arrayed in a sort of semicircle to the east of where Young lay. (RT 115) One person might actually have been holding Young. (RT 115)

Watts immediately summoned an ambulance. (RT 101) He also called for backup units because the crowd was growing hostile. (RT 101-102) As he was managing the crime scene, and waiting for the ambulance to arrive, Trina McQueen, whom he knew from his police work with the Tenderloin Task Force, called to him quietly from the crowd, and told him that she had information for him about the shooting.  (RT 100, 102-104)[2] Watts testified that she "hinted" to him that she had seen the person who shot Young. (Ibid.) She said the shooter was a six-foot to six-foot-one African-American male with braids, who was wearing a blue-and-white leather jacket. (RT 105) She gave him a license plate and a partial description of a vehicle and its direction of travel: a red Mazda or Toyota hatchback, license plate 2KHW408, driving away westbound on Golden Gate toward Jones Street. (RT 104-105)

Watts had had many prior encounters with McQueen in his work in the Tenderloin Task Force, and knew her to be a user of crack cocaine. (RT 113) He knew that she was not always truthful, and that, in fact, she had given him false information in his narcotics investigations. (RT 113) He did not perform any tests to determine whether McQueen was under the influence of narcotics. (RT 119-120) Watts testified that she seemed nervous about being seen talking to him, a uniformed police officer. (RT 103) Watts broadcast the information McQueen gave him, and arranged for her to be taken to the Tenderloin station to be interviewed further.  (RT 105)

---

[2]  Watts' testimony as to the information given to him by McQueen and others was admitted, over defense objection, not for its truth but purportedly to explain Watts' subsequent action. (RT 104-09)

1

### 5.    Testimony of Inspector Raymond Gee Concerning Physical Evidence

2    Some time later, a crime scene investigator, Inspector Raymond Gee, retrieved, and

3    retained as evidence, two articles of clothing that were lying on the ground within the marked

4    intersection near the southeast corner: a blue "Jordan" jersey shirt bearing the number 23; and a

5    white T-shirt which was lying next to it. (RT 72, 75, 78) The jersey shirt had a hole in the back

6    with a red stain, visible to the naked eye, around and below it. (RT 79-80) The white T-shirt had

7    a hole in the lower right portion of the back, with a brownish stain around it. (RT 80) Gee also

8    observed two red stains on the ground within a couple of feet of the clothing. (RT 76)

9    Three spent .380 caliber shell casings were found across the street by the northeast corner

10    near Ariks. (RT 77-78, 81) They were anywhere from several inches to several feet into the

11    crosswalk from the curb. (RT 86-87) Gee identified the spent casings in court, and testified that

12    no fingerprints were found on any of them.  (RT 81-83, 91)

13

### 6.    Testimony of Parking Lot Attendant Egbert Galindo

14

15    After midnight, officers went to the parking lot at 99 Golden Gate Street, which

16    McQueen had spoken of, and interviewed Egbert Galindo who had been working there all

17    evening. (RT 124, 279) Galindo selected petitioner's photo from the photo spread, writing the

18    comment, "Kind of looked like him." (RT 279-281)

19    Galindo testified that at about 6:49 PM that evening, a tall African-American male drove

20    into the lot in a burgundy or maroon Toyota Supra, parked his car, and gave Galindo the keys.

21    (RT 271-272, 274) Galindo entered the license plate number, 2KHW048 into his computer, and

22    gave the man his ticket. (RT 272-273) The man left the lot, and walked away down Golden Gate

23    Street.  (RT 274, 286)[3]

24    During the course of the evening, the man re-entered the lot a few times, and each time he

25    went to his car and then walked away again. (RT 274) On the next-to-last such occasion, he

26    remained at his car for a few minutes before leaving the lot again. (RT 274, 276) Soon after the

27

28    [3]  A private investigator testified during the defense case that it is approximately 150 yards from the parking lot to the northeast corner of Sixth and Market. (RT 360)

**Memorandum in Support of**
**Petition for Writ of Habeas Corpus**          -12-

1    man left the lot, Galindo heard three or four gunshots coming from down Golden Gate Street.

2    (RT 276) Galindo left his booth, which was in the middle of the lot, to see what was going on.

3    (RT 271, 276) He had not seen any people running up the street. (RT 294)

4         Before he reached the street, he saw the man coming back up Golden Gate. (RT 276) The

5    man appeared to have something in his left hand, which was inside his pants. (Ibid.) He entered

6    the lot, walked past Galindo, went straight to his car, and threw something inside. (RT 276-277)

7    Galindo could not determine what the man threw into the car, but did not see a gun. (RT 296)

8         It appeared that the man wanted to drive away, and then realized that Galindo had the

9    keys. (RT 277) He yelled to Galindo to give him his keys, and Galindo went inside his booth,

10   grabbed the keys, and handed them to the man, who came over to the booth to get them. (RT

11   277-278, 295) He appeared nervous. (RT 278) He got into his car, and just as he was about to

12   leave, another man came and got in with him. (RT 278) They drove out of the lot without paying

13   Galindo. (Ibid.) As they drove off, Galindo noticed a black woman standing in front of the lot

14   who appeared to be trying to get the car's license plate. (RT 278-279)

15        Galindo testified that the man was wearing dark jeans, a dark black jacket, and probably a

16   white shirt.  (RT 289) (Galindo had likewise described the man's jacket as dark black during the

17   initial police interview a few hours after the event. [RT 289])  He was not sure whether the man

18   was wearing his jacket the last time he returned to the lot. (RT 293) The man's hair was braided.

19   (RT 290) There were no braids or tassels hanging down. (RT 290) Galindo had seen the man

20   previously when he had parked in the lot on one or more prior occasions. (RT 288)  Galindo

21   identified petitioner in court. (RT 282)

22                    **7.    Testimony of Coroner Boyd Stephens**

23        On May 8, 2003, an autopsy was performed on Karl Young, who had died after being

24   resuscitated in the field by paramedics, and then resuscitated again at the trauma center at San

25   Francisco General Hospital. (RT 54) Boyd G. Stephens, M.D., chief medical examiner for the

26   City and County of San Francisco who was present for the autopsy, testified that Young had

27   received a single gunshot wound. (RT 52, 55)

28

**Memorandum in Support of**
**Petition for Writ of Habeas Corpus**          -13-

1      The bullet had entered from a sufficient distance that no gunpowder, flame, or soot was

2  found on his skin. (RT 55) The bullet entered in the right flank, just above the hip in the small of

3  the back, and traveled on a straight line, grazing the right kidney and the back of the liver,

4  penetrating the heart through the left ventricle, passing through the left lung, and coming to rest

5  beneath the skin in front of the left shoulder. (RT 55-56) The bullet's path within the body was

6  from back to front and from right to left, and upwards approximately 45 degrees relative to the

7  axis of the body. (RT 55-56)

8      In Stephens' opinion, based on the autopsy as well as his training and experience, the

9  cause of death was the gunshot wound, and, more specifically, loss of blood (or "hypovolemic

10  shock") as a result of the perforation of the tissues of the heart. (RT 60-61)

11      From the nature of the injury, one possibility is that Young was fleeing from the shooter,

12  and was bent, ducking. (RT 56) It is not possible, however, that the victim received the wound in

13  mid-back, straight through. (RT 69) Based on the nature of the wound, Stephens stated that

14  Young could have been bending and turning in a rightward direction at the time he received the

15  shot. (RT 64)

16         **8.**    **Further Police Testimony Concerning
Petitioner's Arrest**

17

18      When Officer Watts arrived at work at 4:00 PM on May 8, 2003, he was given

19  petitioner's name as a suspect. (RT 106-107) He was also given a photo of petitioner, and an

20  amended license plate number, 2KHW048. (Ibid.)

21      At around 10:00 PM that evening, while he was patrolling with his partner, on foot and in

22  plainclothes, near Cyril Magnin and O'Farrell, Watts observed a red Toyota, license plate

23  2KHW048, driven by an African-American male, who looked similar to the suspect whose photo

24  he had been given. (RT 107-109) An African-American female was in the front passenger seat.

25  (RT 108) Watts and his partner ran to their unmarked vehicle, and pursued the car. (RT 109)

26  They caught up to it at O'Farrell and Stockton, and broadcast a request for backup. (RT 109)

27  Multiple patrol cars arrived by the time they reached the vicinity of Fourth and Harrison Streets,

28  stopped the red Toyota there, and ordered the occupants to get out of the car. (RT 109-110)

**Memorandum in Support of
Petition for Writ of Habeas Corpus**     -14-

1       Watts, who observed the traffic stop, identified petitioner in court as the driver. (RT 110)

2  Being careful not to touch anything or to allow anyone else to touch anything, Watts looked

3  inside the vehicle, and saw a number of articles of clothing, but he did not see the blue-and-white

4  jacket he was looking for. (RT 111, 118-119)

5       Inspector James Spillane arrived at the scene of the traffic stop, observed the red Toyota

6  from the outside, and saw a couple of jackets inside the car. (RT 132-133) One was a black

7  leather jacket, and the other was multi-colored, including blue, black, red, and perhaps yellow.

8  (RT 133)

9       While the car was being impounded, and taken to a locked facility, Spillane obtained a

10  search warrant. (RT 111, 133-134) When he subsequently searched the car, he did not find the

11  blue-and-white jacket he was looking for, and found neither a gun nor ammunition. (RT

12  140-141) However, he did book the multi-colored jacket as evidence. (RT 134)  Spillane

13  identified the multi-colored jacket, People's Exhibit 12-C, at trial. (RT 137-138)

14  ### 9.    Inspector Spillane's Testimony Concerning Custody of Petitioner's Jacket

15

16       Inspector Spillane testified that after the multi-colored jacket, People's Exhibit 12-C, was

17  seized and booked as evidence, it was stored in an evidence bag in the property control room.

18  (RT 134-135) The prosecutor and judge described the jacket, for the record, as having a leather

19  body which appears blue or black, and blue sleeves made of material. On the back is a white

20  decal, with the letter "A" in blue and red, and a figure which includes two cat heads, and the

21  word "Akademiks" below the letter "A." On the front there is a white figure with red writing

22  saying "Judo." (RT 138)

23       There was an occasion when the jacket was taken from its bag and displayed to defense

24  attorney Chris Hall and defense investigator Paul Kangas inside the police control office. (RT

25  142-143) On that day, the defense looked at "pretty much" all the seized evidence. (RT 143) All

26  the items including the jacket, were, at some point, laid out upon the same table in the police

27  property room. (RT 143)

28       This examination took place before the jacket was sent to the laboratory for GSR

**Memorandum in Support of**
**Petition for Writ of Habeas Corpus**          -15-

1   analysis. (RT 144) On the day in question, there was no butcher paper on the table. (RT 146)

2   Defense Exhibit C depicts the jacket, as Spillane is holding it up and displaying it, and the photo

3   reveals that there is no butcher paper on the table on which all the items had been laid. (RT 147)

### 10.    Police Testimony Concerning Gunshot Residue on Jacket

Linda Abuan, a forensic scientist specializing in gunshot residue analysis, testified that

she received the multi-colored jacket, People's Exhibit 12-C, for testing in late January 2004.

(RT 304, 316) She tested the right and left cuffs of the jacket for gunshot residue ("GSR")

particles, and found GSR particles on both cuffs. (RT 310-313)

Abuan testified that GSR particles can be deposited on the clothes of an actual shooter, as

well as on the clothes of a bystander who is in the shooter's vicinity. (RT 315) GSR particles can

also be transferred from one person's clothing to another's by contact. (Ibid.) She also

acknowledged that she did not know what protective measures might have been taken to prevent

contamination of the jacket before she received it. (RT 317) If it had been placed on a table in the

police property room without protective measures, such as clean butcher paper being placed on

the table, any GSR particles that might have been on the table could have transferred to it. (RT

318) Furthermore, any police officer who handled the jacket without taking protective measures

could have transferred to it any GSR particles on their hands or their clothes. (RT 319)

Finally, it was stipulated that petitioner had been convicted on December 4, 2002 of a

violation of Health and Safety Code section 11359, possession of marijuana for purposes of sale,

a felony. (RT 344)

### B.    The Defense Case

### 1.    Testimony of Percipient Witness Matthew Bell

Matthew Bell ("Mellow") testified that the fight at the intersection of Sixth and Market

was his fourth encounter with Karl Young that day. (RT 379-382, 387)

The first encounter took place at Fifth and Market Streets, when Bell was present while

Young had an argument with an associate of Bell's, named Don Beef. (RT 379-381) Bell did not

become personally involved. (RT 380)

1    The second encounter also occurred at Fifth and Market when Young returned with two
2  or three of his associates, and they all "jumped" Bell's friend, Don Beef. (Ibid.) This time Bell
3  came to his associate's assistance, and participated in the fight with Young and his associates.
4  (Ibid.)

5    The third encounter occurred near Turk and Market. (RT 381) Young approached Bell,
6  who was now with about five of his own associates, and argued with Bell, complaining that Bell
7  had beaten up one of Young's associates in the previous fight. (RT 381, 400) Bell told Young
8  that Young and his associates had jumped Bell's friend, and asked Young what he was supposed
9  to do in such circumstances. (RT 381) Young replied, "I should kill you right now." (Ibid.) As
10  Young spoke these words, he held a small-caliber pistol in his right hand. (Ibid.)

11    The fourth encounter began when Bell was standing with petitioner and a third associate
12  at Sixth and Market, and saw Young approaching at the head of a pack of 15 or 20 people. (RT
13  382) Young renewed the argument, complaining that Bell had beaten Young's friend during the
14  second encounter. (RT 382-383) Bell replied, as he had done during their third encounter, that it
15  wouldn't have happened if Young and his associates hadn't jumped Bell's friend. (RT 383)
16  Young then punched Bell, and Bell who, at 5'8" or 5'9" and weighing 182 pounds was much
17  smaller than Young, fell to the ground. (Ibid.) Thereupon, several of Young's associates joined
18  Young in hitting and kicking Bell as he lay on the ground. (RT 383-384)

19    Petitioner came to Bell's aid, and managed to lift him up from the ground. (RT 384) As
20  petitioner was lifting Bell, Young punched petitioner in the jaw, and petitioner stumbled
21  backwards. (RT 384) By this time, there were about 30 or 40 people gathered there, including
22  Young's 15 or 20 associates from Oakland, and some of Bell's associates from San Francisco.
23  (RT 384, 407)

24    After Young punched petitioner, the two men exchanged argumentative words. (RT 385)
25  Then Young walked away into the street. (Ibid.) As Young reached the Muni traffic island, he
26  made a threatening remark, to the effect, "Do you want to take this to gunplay?" (RT 385)  After
27  Young made the remark, Bell saw him reach down. (RT 398) Bell was fearful that Young was
28  reaching for his gun. Bell left immediately, running away up Golden Gate Street. (RT 385, 398,

Memorandum in Support of
Petition for Writ of Habeas Corpus                    -17-

1    401)

2         Petitioner did not leave at the same moment as Bell. (RT 385) After he left the corner,

3    Bell heard gunshots, and ran even faster. (RT 386) When Bell looked around, petitioner was

4    moving up Golden Gate behind him. (RT 385-386) As they ran up Golden Gate, petitioner

5    caught up with Bell near a parking lot, and said, "My car is in here." (RT 401) They left the lot

6    fast, and petitioner dropped Bell at his house. (RT 386)

7         Petitioner was wearing a white T-shirt. (RT 386) Bell did not see petitioner wearing a

8    blue and white jacket (RT 386), nor did he see him with a gun.  (RT 386) Bell has known

9    petitioner since they were eight or nine years old. (RT 378)  Bell acknowledged having a

10   previous conviction, in San Francisco, for sale of marijuana. (RT 378)

11            **2.     Additional Testimony Concerning Custody of**
                       **Petitioner's Jacket**
12

13        Appearing as a witness for the defense, Spillane identified Defense Exhibit E as a

14   photograph of the shirt Karl Young was wearing when he was shot (the blue "Jordan" jersey with

     the number 23). (RT 353) Defense Exhibit F is a picture of the same shirt, with someone pointing
15
     to the hole in it. (RT 353) In both photographs, Exhibits E and F, Young's shirt is lying on the
16
     table with no butcher paper beneath it. (RT 353-354) These photos were taken in the property
17
     control office on the same day that Spillane met with the defense investigator to view the
18
     multi-colored jacket and all the other evidence. (RT 353)
19
          Spillane acknowledged again that in viewing Defense Exhibit C, the photo in which he is
20
     holding the multi-colored jacket upon which GSR particles were subsequently found, it does not
21
     appear that there is any butcher paper on the table, and stated that, although he recalls that a roll
22
     of butcher paper was available, he does not recall putting any butcher paper down that day. (RT
23
     354-355) Spillane agreed it is certainly possible the jacket had been placed on the table, but
24
     testified on this occasion that he does not recall whether that occurred or not.  (RT 355)
25
          Private investigator Paul Kangas testified that he viewed and photographed physical
26
     evidence in this case, and did so in the property control room. (RT 362) Kangas took the
27
     photographs designated Defense Exhibits E and F, which depict the blue jersey with the number
28

**Memorandum in Support of**
**Petition for Writ of Habeas Corpus**              -18-

23 that Karl Young was wearing when he was shot. (RT 362-363) When he took the

photographs, the jersey was displayed lying on the table. (RT 363)

Kangas identified the multicolored jacket designated People's Exhibit 12-C, and testified

that the first time he observed it, it too was lying on the property table, and had no butcher paper

beneath it. (RT 363-364) There was nothing between the surface of the property table and the

jacket.  (RT 364) Several police officers were in the area at the time. (RT 364)

### 3.    Additional Defense Evidence Concerning Carl Young, Trina McQueen, and Gunshot Residue

The defense introduced additional evidence bearing on various issues implicated by the

state's case, including the following:

San Francisco police officer Eddie Hagen testified that when he had searched Young's

residence in Oakland on March 6, 2002, he found a box of 50 bullets for a 9-millimeter pistol.

(RT 412-413).

Inspector James Spillane testified that he tape-recorded his interview with McQueen at

the Tenderloin station on May 7, 2003, but that when he interviewed her a second time, when she

was in jail on January 16, 2004, he discovered when the interview was over that the tape was

blank. (RT 355-356).

Finally, Martha Blake, manager of the San Francisco Police Department's crime

laboratory, testified that laboratory examination found no GSR particles on either of petitioner's

hands. (RT 345, 347) The test, however, was performed some 24 hours after the alleged

shooting, and the optimal window for obtaining GSR particles from the hands of a shooter is

approximately four hours. (RT 347-348)

//

//

//

//

//

//

**Memorandum in Support of
Petition for Writ of Habeas Corpus**                -19-

1

## ARGUMENT

2  I.  **PETITIONER IS ENTITLED TO HABEAS RELIEF BECAUSE THE STATE**
3     **COURTS UNREASONABLY DISPOSED OF HIS FEDERAL**
       **CONSTITUTIONAL CLAIMS CHALLENGING THE TRIAL COURT'S**
       **REFUSAL TO READ HIS PROFFERED INSTRUCTIONS ON ACTUAL AND**
4     **IMPERFECT SELF-DEFENSE**

5      **A.    Standard of Review**

6          Under AEDPA, 28 U.S.C. § 2254(d), an application for a writ of habeas corpus on behalf

7  of a state court detainee can be adjudicated on the merits and granted if the claim "(1) resulted in

8  a decision that was contrary to, or involved an unreasonable application of, clearly established

9  Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a

10  decision that was based on an unreasonable determination of the facts in light of the evidence

11  presented in the State court proceeding."

12         A state court decision is "contrary to" established federal law within the meaning of §

13  2254(d)(1) if the state court "failed to apply the correct controlling authority from the Supreme

14  Court." *Williams v. Taylor*, 529 U.S. 362, 405-07 (2000).  Circuit precedent may be used as

15  "persuasive authority for purposes of determining whether a particular state court decision is an

16  'unreasonable application' of Supreme Court law," and in ascertaining "what law is 'clearly

17  established.' " *Duhaime v. Ducharme*, 200 F.3d 597, 600-01 (9th Cir.2000)

18         In determining whether a state court decision is contrary to federal law, the federal court

19  on habeas looks to the state's last reasoned decision as the basis for its judgment. *Ylst v.*

20  *Nuuemaker*, 501 U.S. 803-04 (1991).

21         An unreasonable state court disposition of a federal constitutional claim under both §

22  2254(d)(1) and (2) warrants relief where it appears that the underlying error had a "'substantial or

23  injurious effect or influence in determining the jury's verdict.'" *Brecht v. Abrahamson*, 507 U.S.

24  619, 637 (1993) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)).  A habeas

25  petitioner, however, does not bear the burden of showing harm from constitutional error.

26  *Mancuso v. Olivarez*, 292 F.3d 939, 944 n. 1 (9th Cir. 2002).  Furthermore, "[w]here a judge, in a

27  habeas proceeding, applying the [*Brecht*] standard of harmless error, 'is in grave doubt as to the

28  harmlessness of an error,' the habeas 'petitioner must win.'" *California v. Roy*, 519 U.S. 2, 5

1  (1997)

2       **B.    Statement of Facts**

3              **1.    Evidence Supporting the Conclusion that
                       Petitioner Shot the Victim in Actual or Imperfect
4                      Self-Defense**

5       From the outset of the trial, and in addition to raising questions on the issue of identity,

6  the defense sought to show that if petitioner had shot Carl Young, he had done so in the actual

7  and reasonable or unreasonable belief in the need to defend himself. For instance, in his opening

8  statement, defense counsel noted that the evidence would establish the violent tendencies of Mr.

9  Young. (RT 49) The evidence adduced at trial from both prosecution and defense witnesses

10 further developed the defense theory on this point. Thus, among other things, the jury was

11 presented with the following testimony and/or physical evidence relating to circumstances

12 surrounding the shooting of Mr. Young:

13      1) Prosecution and defense witnesses described a *fight* involving Bell, the much larger

14 Young, and a number of Young's friends just prior to the shooting (RT 212-16 [prosecution

15 witness David Pugh]; 249, 253 [prosecution witness Trina McQueen]; 383-85 [defense witness

16 Matthew Bell]);

17      2) Matthew Bell described how petitioner Cole came to Bell's aid while he was "kicked,"

18 "jumped, and "getting his ass kicked," after which Young hit Cole in the jaw (RT 384-85);

19      3) Bell described how Cole and Young then exchanged heated words on the corner; (RT

20 384-85);

21      4) Bell testified that as Young walked out onto Market Street, he made a "threatening

22 remark," specifically, that Young had said, "Do you want to take this to gunplay." (RT 385);

23      5) Prosecution witness Pugh likewise testified that as Young walked out onto Market

24 Street, he made a remark about "taking it to gunplay." Pugh provided three versions of the

25 remark: (A) "You guys jumped me and we jumped y'all, so we can leave it at that or we can take

26 it to gunplay, whatever." (RT 198); (B): "You guys jumped me. We jumped y'all. We could

27 squash you. If you guys want to take it to gunplay, then that's fine." (RT 229); and (C): "If you

28 want to take it to gunplay, that's fine" (RT 215);

**Memorandum in Support of
Petition for Writ of Habeas Corpus**          -21-

1    6) Pugh testified that Young's statement about "taking it to gunplay" was made "a couple

2  of seconds" before the shooting (RT 220);

3    7) Bell described how, after making the statement about "taking it to gunplay, *Young*

4  *reached down* in a way that made Bell believe Young was reaching for a gun (RT 398, 401);

5    8) Bell testified that Cole was standing next to him on the corner at the time when Young

6  made his statement about "taking it to gunplay" and reached down. (RT 401);

7    9) San Francisco Coroner Boyd Stephens described Young as having weighed 228

8  pounds and having been "very muscular" at the time of his death (RT 69-70)[4]; and

9    10) Based on the nature of Young's fatal wound, coroner Stephens testified that Young

10  could have been bending and turning at the time he received the fatal shot (RT 64, 69; *see also*

11  RT 501 [prosecutor concedes that Stephens had testified fatal wound was consistent with Young

12  having bent and turned])

13           **2.    The Trial Court's Refusal of Proffered Defense**
               **Instructions on Complete and Imperfect Self-**
14             **Defense**

15    During an instructional conference prior to closing argument, the trial court stated that it

16  would "give [CALJIC] 8.40, which is the voluntary manslaughter description, deleting the 'self-

17  defense' or 'defense or others' sections relating to that instruction." (RT 420)  The court then

18  noted that the defense had proposed the instruction and inquired as to the basis for it.  (RT 420-

19  21) Defense counsel responded that he had, in fact, requested "the entire sequence" of self-

20  defense instructions (i.e., both those which constitute a complete defense to a homicide charge[5]

21  and the "imperfect self-defense" instructions contained in CALJIC 8.40[6] and elsewhere, all of

22

23    [4]  According to Stephens and prosecution witness Pugh, Young had tattoos, at least one of
     which, on his arm or shoulder, depicted a skeleton holding a smoking revolver (RT 65-67

24   [Stephens]; RT 222 [Pugh]; Def. Exh. A, B [admitted at RT 98]).

25    [5]  As to complete or actual self-defense, under California Penal Code section 197(3), a
     homicide is justifiable when, *inter alia*, ". . . there is reasonable ground to apprehend a design to
26   commit a felony or to do some great bodily injury, and imminent danger of such design being
     accomplished. . . " *Ibid.*

27    [6] CALJIC 8.40 defines the crime of voluntary manslaughter and states, in relevant part:

28    Every person who unlawfully kills another human being [without malice

**Memorandum in Support of**
**Petition for Writ of Habeas Corpus**          -22-

1   which operate to preclude a finding of malice, and hence murder, in a homicide case).

2   When the court inquired as to the basis for the "complete" self-defense instructions,

3   counsel cited the coroner's testimony that the wound to Young was consistent with his having

4   been bent over and turning at the time of the fatal shot. (RT 421) Defense counsel also cited

5   Bell's testimony that, immediately prior to the shooting, Young (1) had stated, "Do you want to

6   take this to gunplay" and (2) had made a motion as though reaching for something. (Ibid.)

7   Defense counsel continued: "I realize the defendant did not testify, but the position of the

8   defense [is] the defendant could have the same apprehension as did Matthew Bell, ergo, he would

9   be entitled to self-defense." (RT 421)

10  Responding to this argument, the prosecutor contended that there was "no link between

11  Mr. Bell's knowledge and whether or not Mr. Cole, the defendant had any knowledge. . . . So

12  even if you believe Mr. Bell's account as to the motion, you can't impute any knowledge of gun

13  or threat, any knowledge of those items, to the defendant, Mr. Cole." (RT 422)

14  The trial court then ruled as follows:

15          All right. I believe the testimony that Mr. Bell provides gives the
            Court some reason to entertain the instructions relating to
16          involuntary manslaughter. *The Court does not find that
            instructions relating to self-defense or defense of others is*
17          *appropriate, because those instructions appear to require evidence
            of what the defendant believed in regard to those issues, and we do*
18          *not have that evidence, and I don't believe Mr. Bell's evidence can
            be imputed to the defendant.* So I am not going to give the self-
19          defense or defense of others instructions at this time.

20  (RT 422) (Emphasis added)

21  Defense counsel thereafter stated that he and his co-counsel had discussed the self-

22  defense theory with Mr. Cole; that presentation of the theory "in deference to the prosecution"

---

23
24          aforethought but] either with an intent to kill, or with conscious disregard for
            human life, is guilty of voluntary manslaughter in violation of Penal Code section
25          192, subdivision (a).

26          [There is no malice aforethought if the killing occurred [upon a sudden quarrel or
            heat of passion] [or] [*in the actual but unreasonable belief in the necessity to
            defend* [oneself] [or] [another person] *against imminent peril to life or great*
27          *bodily injury*].] . . .

28  *Ibid.* (Emphasis added)

**Memorandum in Support of**
**Petition for Writ of Habeas Corpus**          -23-

1   would have required Cole to testify; and that Cole did not wish to testify, a matter which counsel

2   would place on the record. (RT 423) The parties then presented argument as to whether the

3   optional "heat of passion" language in 8.40 should be read to the jury as a basis for finding

4   voluntary manslaughter in place of murder.  (RT 423-25) The trial court thereafter ruled that the

5   "heat of passion" language contained in CALJIC 8.40 and related instructions would be

6   provided. (RT 425-26)

7          The prosecutor then asked: "The voluntary manslaughter that will be given relates only to

8   sudden quarrel and heat of passion, not into [sic] self-defense?"  The following exchange then

9   occurred:

10              THE COURT: That's correct.  In 8.40, the Court is deleting the
                portion regarding the actual, but unreasonable belief, and the
11              necessity to defend one's self or another against peril.

12              [DEFENSE COUNSEL]: *Although the defense did request that
                addition, I think for the same reason the Court refused.*

13
                THE COURT: *That's correct.  The defense requested that in the*
14              *same vein as requesting the self-defense series under the 500*
                *series, and the Court denies that request for the self-defense-*
15              *related instructions.*

16   (RT 426) (Emphasis added)  Having so ruled, the court stated that it would read CALJIC 8.50,

17   but that it would delete that portion addressing imperfect self-defense and stating that to establish

18   that the killing was murder rather than manslaughter, the People must establish that the act which

19   caused the death was not done in the actual, even though unreasonable, belief in the necessity to

20   defend against imminent peril or great bodily injury.  (RT 426; CALJIC 8.50)

21          **C.    Clearly Established Constitutional Precedent Holds That a Trial
                    Court Must Instruct on Self-Defense in a Homicide Case Where the**
22          **Defendant Seeks to Rely on That Defense and the Evidence Would
                    Permit a Finding That It Applies**

23          The Fifth and Fourteenth Amendments to the United States Constitution establish that the

24   prosecution bears the burden of proving all elements of the offense charged and must persuade

25   the factfinder 'beyond a reasonable doubt' of the facts necessary to establish each of those

26   elements. *Fiore v. White*, 531 U.S. 225, 228-229 (2001); *Sullivan v. Louisiana*, 508 U.S. 275,

27   277-278(1993). See also *Estelle v. McGuire*, 502 U.S. 62, 69 (1991) ("[T]he prosecution must

28

1   prove all the elements of a criminal offense beyond a reasonable doubt").

2       Instructions that omit or misstate an element of a criminal offense violate the Due Process

3   Clause of the federal constitution's Fifth and Fourteenth Amendments. *United States v. Gaudin*,

4   515 U.S. 506, 509-10 (1995); *Osborne v. Ohio*, 495 U.S. 103, 122-24 & n. 17 (1990); *Sandstrom*

5   *v. Montana*, 442 U.S. 510, 521-24 (1979); *see also Keating v. Hood*, 191 F.3d 1053, 1061 (9th

6   Cir. 1999) ("[I]nstructions that allow a jury to convict without finding every element of the

7   offense violate *In re Winship's* [397 U.S. 358, 364 . . . (1970) ] requirement that 'every fact

8   necessary to constitute the crime' must be proven beyond a reasonable doubt.")

9       Furthermore, it has long been established that, "[w]hether rooted directly in the Due

10  Process Clause of the Fourteenth Amendment, or in the Compulsory Process or Confrontation

11  clauses of the Sixth Amendment, the Constitution guarantees criminal defendants 'a meaningful

12  opportunity to present a complete defense.' " *Crane v. Kentucky,* 476 U.S. 683, 690 (1986)

13  (internal citations omitted and quoting *California v. Trombetta*, 467 U.S. 479, 485 (1984); see

14  also *Holmes v. South Carolina*, ___ U.S. ___, 126 S.Ct. 1727, 1731 (2006) (affirming this

15  principle).   Equally well-established is the principle that "a defendant is entitled to an instruction

16  as to any recognized defense for which there exists evidence sufficient for a reasonable jury to

17  find in his favor." *Mathews v. United States,* 485 U.S. 58, 63 (1988);  *see also Stevenson v.*

18  *United States,* 162 U.S. 313(1896).

19      Actual self-defense and imperfect self defense are both recognized under California law,

20  as they are under the law of every other state.  As to the former, under California Penal Code

21  section 197(3), a homicide is justifiable when, *inter alia*, ". . . there is reasonable ground to

22  apprehend a design to commit a felony or to do some great bodily injury, and imminent danger of

23  such design being accomplished. . . " *Ibid.*  Apparent necessity is sufficient to invoke this

24  doctrine of "complete" self-defense; the defendant may act on an actual and reasonable belief

25  that imminent danger exists. *People v. Dawson*, 88 Cal.App.2d 85, 96 (1948).  Furthermore, a

26  defendant's personal situation and knowledge are relevant in determining the objective

27  reasonableness of his actions. *People v. Humphrey*, 13 Cal.4th 1073, 1083 (1996).  Thus,

28  "although the ultimate test of reasonableness is objective, in determining whether a reasonable

1    person in defendant's position would have believed in the need to defend, the jury must consider

2    all of the relevant circumstances in which defendant found [himself]." *Ibid.*

3    Imperfect self-defense has a different legal definition and its application entails different

4    legal consequences. Imperfect self-defense appears where the defendant harbors an actual but

5    unreasonable belief that it is necessary to defend oneself from imminent peril to life or great

6    bodily injury. The presence of such a belief likewise negates malice aforethought, the mental

7    element necessary for murder, such that the chargeable offense is reduced to manslaughter. *In Re*

8    *Christian S.*, 7 Cal.4th 574, 576 (1994); *People v. Flannel,* 25 Cal.3d 668, 680 (1979)

9    California law — as it must — also incorporates and adheres to the federal constitutional

10   principle expressed in *Matthews* as to the evidentiary *conditions* under which instruction on a

11   given defense, including actual or imperfect self-defense, is mandated. See, e.g., *People v.*

12   *Breverman*, 19 Cal.4th 142, 157 (1998) (trial court has sua sponte duty to instruct on particular

13   defense " . . if it appears that the defendant is relying on such a defense, or if there is substantial

14   evidence supportive of such a defense and the defense is not inconsistent with the defendant's

15   theory of the case.") *People v. Elize* (1999) 71 Cal.App.4th 605, 615 (under *Breverman*, must

16   give self-defense instruction where evidence supporting it is substantial, i.e., if a reasonable jury

17   could find it persuasive); *People v. Flannel*, 25 Cal.3d at 684 ( trial court must instruct on this

18   doctrine of imperfect self-defense whenever there is sufficient evidence from which reasonable

19   jurors could conclude the facts underlying the instruction exist.); see also *id*. ("The fact that the

20   evidence may not be of a character to inspire belief does not authorize the refusal of an

21   instruction based thereon. That is a question within the exclusive province of the jury.").

22   Finally, as the Supreme Court has also recognized, the prosecution's constitutional

23   obligation to prove to a jury all the elements of a criminal offense and the defendant's right to

24   instructions on a given defense may converge under certain circumstances in a criminal case.

25   The Court has expressly held that a state trial court violates the Due Process Clause of the

26   Fourteenth Amendment when it fails to require the prosecution to prove beyond a reasonable

27   doubt the absence of the heat of passion on sudden provocation when the issue is properly

28   presented in a homicide case. *Mullaney v. Wilbur*, 421 U.S. 684. Application of this same

1   principle manifestly requires the prosecution to prove beyond a reasonable doubt, as an element

2   of murder, the *absence* of actual self defense and imperfect self defense when the issue is

3   properly presented in a homicide case:

4   > If the issue of . . . imperfect self-defense is . . . "properly
    > presented" in a murder case (*Mullaney v. Wilbur* (1975) 421 U.S.

5   > 684, 704, 95 S.Ct. 1881, 44 L.Ed.2d 508), the *People* must prove
    > *beyond reasonable doubt* that these circumstances were *lacking* in

6   > order to establish the murder element of malice.

7   *People v. Rios*, 23 Cal.4th 450, 461-62 (2000) (Emphasis in original). *See also People v.*

8   *Humphrey*, 13 Cal.4th 1073, 1103 (1996) (applying same principle where both actual and

9   imperfect self-defense at issue); *People v. Pineiro*, 129 Cal.App.3d 915, 921 (1982) (cited in

10  *Humphrey* and applying principle where actual self-defense at issue).

11      **D.**    **The Trial Court Unreasonably Determined That The Evidence
    Did Not Support Instructions On Complete and Imperfect Self-**

12  **Defense**

13      As demonstrated by the colloquy between the trial court and counsel during the

14  instructional conference described in section B, *supra*, the trial court apparently adopted the

15  prosecutor's suggestion that instruction on complete or imperfect self-defense was unwarranted

16  because petitioner Cole had not testified. As the Court stated, "The Court does not find that

17  instructions relating to self-defense or defense of others is appropriate, because those instructions

18  appear to require evidence of what the defendant believed in regard to those issues, and we do

19  not have that evidence, and I don't believe Mr. Bell's evidence can be imputed to the defendant."

20  (RT 422)

21      The trial court's implicit conclusion that petitioner Cole's testimony was a required

22  condition to instruction on imperfect self defense as a means of defeating the state's murder

23  charge was flatly erroneous. In *People v. De Leon*, 10 Cal.App.4th 815 (1992):

24  > [N]ot in issue is the legal significance of the defendant not
    > testifying. Substantial evidence of a defendant's state of mind,

25  > including an "honest but unreasonable belief in the necessity to
    > defend against imminent peril to life" (CALJIC No. 5.17), may be

26  > present *without* defendant testimony. (People v. Castillo (1987)
    > 193 Cal.App.3d 119, 126 []; People v. Anderson (1983) 144

27  > Cal.App.3d 55, 62 [].)

28  10 Cal.App.4th at 824 (emphasis in original and parallel citations omitted); *see also CALJIC*

1   2.02 (explaining, *inter alia*, that "the mental state with which an act is done may be shown by the
2   circumstances surrounding the commission of the act.")

3       The same rule holds true in cases where the availability of instructions on complete self-
4   defense is at issue. Thus, in *People v. Elize*, *supra*, the Court held that the trial court should have
5   instructed on self-defense in an assault case where the evidence was sufficient to support it
6   notwithstanding the fact that the defendant had testified that a shooting had been accidental, i.e,
7   in a manner that was patently inconsistent with a claim that he fired in response to a perceived
8   threat of imminent peril. *Id.*, 71 Cal.App.4th at 605, 615-16.

9       Putting aside the legally insignificant decision of Mr. Cole not to testify in the present
10  matter, moreover, the *circumstances* surrounding the shooting of Mr. Young supplied an ample
11  evidentiary basis for the requested instructions on both complete and imperfect self-defense.
12  Various witnesses described an altercation at Sixth and Market involving Young, Matthew Bell,
13  and others who were siding with Young. Bell's testimony could well lead reasonable jurors to
14  conclude that petitioner had come to Bell's defense, and that he had argued with and been struck
15  in the face by Young. Moreover, Bell, corroborated in part by Pugh, testified as to Young's
16  threat of "gunplay" prior to the shooting.

17      Of great importance, Bell saw Young reaching for something immediately after the
18  gunplay remark, and it is surely reasonable to conclude that Cole, if the shooter, was watching
19  Young at the same time. Beyond this, the coroner confirmed that the location of the shot was
20  consistent with Young having turned at the time of firing, a circumstance that, in conjunction
21  with "gunplay" remark and reaching movement, likewise suggests conduct by Young would have
22  been perceived as threatening death or great bodily harm against the shooter.

23      All of the foregoing circumstances, in turn, supply the requisite evidentiary foundation for
24  inferring that Cole harbored an actual and reasonable or unreasonable belief that he was in
25  imminent danger of death or great bodily harm from Young at the time of the shooting. The trial
26  court accordingly erred in refusing the proffered instructions on complete and imperfect self-
27  defense.

28

                                        / /

1

### E.    The Court of Appeal Unreasonably Rejected Petitioner's Claims on Appeal

2

The April 21, 2006 state court of appeal's disposition of petitioner's federal constitutional

3

claims, decision, which disposition the state Supreme Court declined to review, was

4

unreasonable within the meaning of 18 U.S.C. section 2254(d)(1). That is primarily so because

5

the appellate court failed to recognize and apply clearly established federal constitutional

6

precedent and principles that required the trial court to instruct on actual and imperfect self

7

defense in order to (1) hold the state to its burden of proving to the jury all the elements and (2)

8

vindicate petitioner's right to present a meaningful defense on which he relied. The disposition

9

was equally unreasonable within the meaning of section 2254(d)(2) because, in affirming the trial

10

court's refusal of the proffered instructions, the appellate court unreasonably construed the

11

relevant facts which, fairly viewed, plainly would have permitted a rational juror to entertain a

12

reasonable doubt that petitioner had shot Mr. Young in the absence of actual or imperfect self-

13

defense.

14

As to these claims, two points in particular bear emphasis:

15

*First*, the appellate court concluded that the evidence supplied no support for the

16

conclusion that Mr. Cole perceived a threat of *imminent* harm, stating:

17
18
19
20
21

> The circumstances of the shooting in the present case are inconsistent with any fear of imminent harm on the part of appellant. Although appellant and the victim had recently engaged in fisticuffs, that encounter had ended. The victim was walking away, with his back turned, and there was no evidence that appellant was faced with any immediate or imminent threat. The fact that the victim had made a comment that could be interpreted as a threat to engage in a shootout with appellant *at some unspecified later time* did not amount to a threat of *imminent* harm.

22

(Slip. Op., at 5) (Emphasis in original)

23

This analysis, however, cannot be reconciled with the evidence that Young stated "do you

24

want to take it to gunplay" (RT 385 [Bell]); that at the time of making the remark, Young

25

reached down (RT 398, 401 [Bell]); and that the time between the statement and the shooting

26

was a couple of seconds (RT 220 [Pugh]); and that Young could have been bending and turning

27

when shot (RT 64, 69 [Stephens]). A statement about taking it to gunplay coupled immediately

28

with a reaching motion reasonably leads to an inference that Cole perceived Young as acting on a

**Memorandum in Support of
Petition for Writ of Habeas Corpus**                -29-

threat to shoot rather than "threat[ening] to engage in a shootout with [Cole] at some unspecified later time . . ." Indeed, the Court of Appeal could only adhere to the view that Young did not threaten "imminent" harm by improperly crediting one version of events and discrediting others, as it was clearly prohibited from doing. *United States v. Kessee,* 992 F.2d 1001, 1004 (9th Cir. 1993); *People v. Elize, supra,* 71 Cal.App.4th at 615.

Second, the Court of Appeal deemed it "most critical" that "there [was] no evidence that before appellant [Cole] began shooting, *appellant* saw or thought he saw any weapon in the victim's possession, or saw or thought he saw that the victim was reaching for any weapon," notwithstanding the fact that there was "some evidence that the victim may have bent over or reached down around the time of the shooting." (Slip. Op., at 5)

Significantly, although the court of appeal acknowledged the principle stated in *DeLeon, supra* (Slip. Op., at 3) on this point, the court patently failed to apply it. Again, that principal holds that circumstantial evidence, as reported by witnesses other than defendant, can provide as compelling a basis for an instruction on self-defense or similar "state of mind" defense as can the direct testimony of the defendant. Thus, in *DeLeon,* the issue was whether the defendant, who did not testify, had been entitled to imperfect self-defense instructions after he had shot and killed a victim at close range. In its analysis of that issue, the reviewing court imputed to the defendant circumstantial evidence concerning what the defendant might have perceived, including the observations of several witnesses to both the shooting and preceding events. It was only because none of those witnesses described circumstances that supported the defendant's claimed perception of a threat, reasonable or otherwise, that the Court of Appeal ruled the instructions had been properly refused. *DeLeon,* 10 Cal.App.4th at 820, 824-25. Thus, in assessing whether the evidence provided rational support for the instructions, the Court looked to what the defendant might have observed, based on the testimony of *other* witnesses to the event.

Similarly, in *People v. Anderson,* 144 Cal.App.3d 55 (1983) (cited with approval in *DeLeon,* 10 Cal.App.4th at 824), the reviewing court considered the defendant's claim of instructional error based on the trial court's refusal to instruct, under *People v. Mayberry,* 15 Cal.3d 143 (1975), that a good faith belief in consent would eliminate the intent needed to

1  sustain convictions for forcible rape, forcible oral copulation, and false imprisonment of two

2  girls. Although the testimony of the defendant's young son, who witnessed the events, might

3  have supported a finding that the girls had appeared to consent to the conduct, the trial court —

4  in words analogous to those employed by the trial court in this case — refused the requested

5  *Mayberry* instruction, stating:

> I have considered the testimony of the boy, who may be helpful on
> the charges, but who did not help us with any testimony as to what
> the Defendant's belief may or may not have been.

8  *Anderson*, 144 Cal.App.3d at 61.

9  The *Anderson* Court reversed, and in doing so emphatically rejected the suggestion that

10  the defendant's testimony was a necessary predicate to the *Mayberry* charge. The Court

11  observed:

> The flaw in the [state's] argument is that it assumes a person's
> state of mind can only be shown by direct evidence. *It is*
> *elementary that a defendant's state of mind is most often shown*
> *through circumstantial evidence which often prevails over the*
> *direct testimony of the defendant to the contrary.*

15  *Anderson*, 144 Cal.App.3d at 62 (Emphasis added); *see also People v. Castillo,* 193 Cal.App.3d

16  119 (1987) (also cited with approval in *DeLeon*, 10 Cal.App.4th at 824, and holding that trial

17  court erred when it failed to instruct that defendant's good faith belief in victim's consent

18  operated as defense to charge of penetration by foreign object because, though defendant did not

19  testify, victim's account of her own conduct provided sufficient evidentiary basis for defendant's

20  likely perceptions.)

21  Applying the principal underlying *DeLeon, Anderson, Castillo,* and related precedent, it

22  was thus entirely appropriate to consider, *inter alia,* the observations of witnesses Bell and Pugh,

23  as well as the findings of the coroner, in determining what Mr. Cole might have perceived

24  immediately prior to Young's shooting. In this assessment, it bears emphasis that according to

25  Bell, Young had struck petitioner in the face and exchanged heated words with him, giving Cole

26  every reason to perceive Young as willing to employ violence against him.

27  In addition, and of great importance, *petitioner,* by Bell's account, *was standing next to*

28  *Bell on the corner at the time that Young made his statement about "taking it to gunplay" and*

1  *appeared to reach down.* (RT 401:1-3) That circumstance alone compels the inference that Cole

2  likely heard what Bell and Pugh heard, and saw what Bell saw. That inference is further

3  bolstered if, as the prosecution contended, Cole aimed his gun at Young, for by doing so, Young

4  was necessarily in petitioner's line of sight before the shooting. Of course, that Cole likely saw

5  and heard what Bell did renders absolutely relevant the coroner's testimony that Young's

6  position at the time he was shot was consistent with a bending and turning motion. Such

7  testimony supplies independent corroboration for what Bell and, by logical inference, Cole, likely

8  perceived.

9       Accordingly, the appellate court's conclusion that the record does not disclose substantial

10  evidence supporting the requested defense instructions was patently erroneous and unreasonable.

11  **F.    The Trial Court's Unreasonable Refusals to Instruct on
            Complete Self Defense and Imperfect Self Defense Were**
12  **        Prejudicial Within the Meaning of *Brecht***

13       As noted in subsection A, above, an unreasonable state court disposition of a federal

14  constitutional claim under both § 2254(d)(1) and (2) warrants relief where it appears that the

15  underlying error had a "'substantial or injurious effect or influence in determining the jury's

16  verdict.'" *Brecht v. Abrahamson*, 507 U.S. 619 at 637.[7] Perceiving such an effect does not

17  require a finding that the error more likely than not affected the verdict, but simply a significant

18  chance that it did so. See *Kyles v. Whitley*, 514 U.S. 419, 435-436 (1995) (reasonable probability

19  of impact on verdict for purposes of finding "materiality" under standard of *Brady v. Maryland*,

20  373 U.S. 83 (1963), requires finding of *greater* prejudice than does *Brecht*, but even so does not

21  require finding of likely harm by preponderance of the evidence); *Kotteakos*, 328 U.S. at 764-765

22  (applying prejudice standard later adopted in *Brecht*, Court holds that judgment may be affirmed

23  notwithstanding error only where, ". . . when all is said and done, the [court] is sure that the error

24  did not influence the jury, or had but very slight effect. . ."); *see also United States v. Lopez*, 514

25

26  [7] The state appellate court failed to conduct any harmless error review because it declined
    to find any instructional error. In the absence of any state prejudice analysis, no issue is or can be
27  raised as to the reasonableness of such analysis. *Cargle v. Mullin,* 317 F.3d 1196, 1220, 1224
    (10th Cir.2003) ("If the state courts did not address a harmless-error issue . . . we apply the
    standard generally adopted for habeas purposes in *Brecht v. Abrahamson*.") (quoted and cited
28  with approval in *Inthavong v. LaMarque*, 420 F.3d 1055, 1059-60 [9th Cir. 2005])

1  U.S. 549, 557 (1995) effect is "substantial" for Commerce Clause purposes when it is more than

2  *de minimis*).

3      The trial court's erroneous refusals to instruct on complete and imperfect self-defense

4  mandate reversal under the foregoing test because it is reasonably probable petitioner would have

5  obtained a more favorable result had the instructional error not occurred.

6      Again, a properly instructed jury would have been required to find the *absence* of actual

7  and imperfect self-defense beyond a reasonable doubt in order to find petitioner guilty of murder.

8  Here, if they accepted Bell's account of events, jurors would have had ample grounds for finding

9  that Cole had been beaten and verbally challenged by Young; that Cole, like Bell, heard Young's

10  threat concerning gun use prior to the shooting; and that Cole perceived the same movement by

11  Young that Bell had perceived prior to the shooting. Crediting the coroner's testimony, jurors

12  would further have grounds for finding that Young may have been turning as he made his

13  reaching movement, and that Cole had seen him do so.[8]

14      In light of this evidence and the other testimony described in subsection B.1, above, it is

15  more than merely possible that, given the instructions, jurors would have entertained a reasonable

16  doubt as to the absence of actual or imperfect self-defense. Stated otherwise, a properly

17  instructed jury might well have found a reasonable possibility that Mr. Cole had acted in actual

18  or imperfect self-defense. Any conclusion that omission of the requested instructions was without

19  a cognizable effect on the verdict would therefore be untenable. The error was accordingly

20  prejudicial within the meaning of *Brecht*.

21                                  //

22                                  //

23                                  //

24                                  //

25                                  //

26

27      [8] Furthermore, and for the reasons previously set forth, neither the trial court nor the state
    appellate courts could question the credibility of the accounts provided by Bell or the coroner in
28  assessing the instructional request.

**Memorandum in Support of**
**Petition for Writ of Habeas Corpus**          -33-

1

## CONCLUSION

2    As set forth above, the state courts unreasonably disposed of petitioner's federal

3 constitutional claims arising from the trial court's instructional errors, and there is a reasonable

4 probability that those errors affected the verdict. This Court should therefore grant petitioner the

5 habeas relief he requests and order him released from custody unless he is afforded a new trial

6 within a reasonable period of time.

7    Dated: December 6, 2007                    Respectfully submitted,

8                                               DENNIS P. RIORDAN
                                                DONALD M. HORGAN
9
                                                RIORDAN & HORGAN
10

11                                             By: _____/s/_____
                                                    Donald M. Horgan
12
                                                Attorneys for Petitioner
13                                              EDDIE COLE

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1    **PROOF OF SERVICE BY MAIL -- 1013(a), 2015.5 C.C.P.**

2    **Re:**    <u>**Cole v. Felker**</u> **No. C 07 5183**

3        I am a citizen of the United States; my business address is 523 Octavia Street, San

4    Francisco, California 94102.  I am employed in the City and County of San Francisco, where this
     mailing occurs; I am over the age of eighteen years and not a party to the within cause.  I served

5    the within:

6    **MEMORANDUM IN SUPPORT OF VERIFIED**
     **PETITION FOR A WRIT OF HABEAS CORPUS**
7

8    on the following person(s) on the date set forth below, by placing a true copy thereof enclosed in

9    a sealed envelope with postage thereon fully prepaid, in the United States Post Office mail box at
     San Francisco, California, addressed as follows:

10
     **Lisa Ashley Ott**
11   **Deputy Attorney General**
     455 Golden Gate Avenue, Suite 11000
12   San Francisco, CA 94102

13   **[x]  BY MAIL:**   By depositing said envelope, with postage thereon fully prepaid, in the United

14   States mail in San Francisco, California, addressed to said party(ies);

15   **[ ]  BY PERSONAL SERVICE:** By causing said envelope to be personally served on said
     party(ies), as follows:   **[ ] FEDEX     [ ] HAND DELIVERY**

16       I certify or declare under penalty of perjury that the foregoing is true and correct.

17   Executed on December 6, 2007 at San Francisco, California.

18

19              _____*/s/*_____
                       Jocilene Yue

20

21

22

23

24

25

26

27

28