1  EDMUND G. BROWN JR.
   Attorney General of the State of California
2  DANE R. GILLETTE
   Chief Assistant Attorney General
3  GERALD A. ENGLER
   Senior Assistant Attorney General
4  GREGORY A. OTT
   Deputy Attorney General
5  LISA H. ASHLEY OTT
   Deputy Attorney General
6  State Bar No. 164811
      455 Golden Gate Avenue, Suite 11000
7     San Francisco, CA 94102-7004
      Telephone: (415) 703-5978
8     Fax: (415) 703-1234
   Attorneys for Respondent
9
                    IN THE UNITED STATES DISTRICT COURT
10
                  FOR THE NORTHERN DISTRICT OF CALIFORNIA
11
                            SAN JOSE DIVISION
12

13  **EDDIE COLE,**                              C 07-5183 JF

14                                 Petitioner,

15           **v.**

16  **TOM FELKER, Warden,**

17                                 Respondent.

18

19        **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ANSWER**

20

21

22

23

24

25

26

27

28

1

**TABLE OF CONTENTS**

2

**Page**

3

INTRODUCTION                                                                    1

4

STATEMENT OF THE CASE                                                           1

5

STATEMENT OF FACTS                                                              2

6

STANDARD OF REVIEW                                                             13

7

ARGUMENT                                                                       14

8

        **PETITIONER'S FEDERAL CONSTITUTIONAL RIGHTS
WERE NOT VIOLATED BY THE TRIAL COURT'S REFUSAL**

9

        **TO INSTRUCT THE JURY PURSUANT TO HIS PROPOSED
INSTRUCTIONS ON COMPLETE AND IMPERFECT SELF-**

10

        **DEFENSE**                                                    14

11

        A.    Petitioner's Claim Does Not Provide A Basis For Relief Under
The AEDPA

12

                                                     14

13

        B.    The California Court Of Appeal Reasonably Rejected Petitioner's
Instructional Error Claim                                                       16

14

        C.    Any Error Was Harmless                                        19

15

CONCLUSION                                                                     20

16

17

18

19

20

21

22

23

24

25

26

27

28

1

# TABLE OF AUTHORITIES

2
**Page**

3
**Cases**

4
*Avila v. Galaza*
297 F.3d 911 (9th Cir. 2002)                                                    16
5

*Beardslee v. Woodford*
6
358 F.3d 560 (9th Cir. 2003)                                                    16

7
*Bradley v. Duncan*
315 F.3d 1091 (9th Cir. 2002)                                                   16
8

*Brecht v. Abrahamson*
9
507 U.S. 619 (1993)                                                          13, 19

10
*Carey v. Musladin*
549 U.S. 70, 127 S. Ct. 649 (2006)                                          13, 16
11

*Crane v. Kentucky*
12
476 U.S. 683 (1986)                                                             14

13
*Duhaime v. Ducharme*
200 F.3d 597 (9th Cir. 2000)                                                    16
14

*Early v. Packer*
15
537 U.S. 3 (2002)                                                            13, 15

16
*Fry v. Pliler*
___ U.S. ___, 127 S. Ct. 2321 (2007)                                        14, 19
17

*Gilmore v. Taylor*
18
508 U.S. 333 (1993)                                                          14-16

19
*Holgerson v. Knowles*
309 F.3d 1200 (9th Cir. 2002)                                                   16
20

*Lockyer v. Andrade*
21
538 U.S. 63 (2003)                                                              13

22
*Mathews v. Unites States*
485, U.S. 58 (1988)                                                          14-16
23

*Stevenson v. United States*
24
162 U.S. 313 (1896)                                                             15

25
*Teague v. Lane*
489 U.S. 288 (1989)                                                             14
26

*Texas v. Cobb*
27
532 U.S. 162 (2001)                                                             15

28

**TABLE OF AUTHORITIES  (continued)**

**Page**

*Williams v. Taylor*
529 U.S. 362 (2000)                                                    13

*Woodford v. Visciotti*
537 U.S. 19 (2002)                                                     13


**Statutes**

Penal Code
        § 187                                                           1
        § 12021                                                         1
        § 12022.5                                                       2
        § 12022.53                                                      2

United States Code
        Title 28, § 2254                                          13, 16, 19


**Court Rules**

Federal Rules of Criminal Procedure
        § 31(c)                                                        15

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1  EDMUND G. BROWN JR.
   Attorney General of the State of California
2  DANE R. GILLETTE
   Chief Assistant Attorney General
3  GERALD A. ENGLER
   Senior Assistant Attorney General
4  GREGORY A. OTT
   Deputy Attorney General
5  LISA H. ASHLEY OTT
   Deputy Attorney General
6  State Bar No. 164811
     455 Golden Gate Avenue, Suite 11000
7    San Francisco, CA 94102-7004
     Telephone: (415) 703-5978
8    Fax: (415) 703-1234
   Attorneys for Respondent
9

10                 IN THE UNITED STATES DISTRICT COURT

11             FOR THE NORTHERN DISTRICT OF CALIFORNIA

12                        SAN JOSE DIVISION

13  **EDDIE COLE,**                         C 07-5183 JF

14                            Petitioner,   **MEMORANDUM OF POINTS
                                            AND AUTHORITIES IN**
15        **v.**                            **SUPPORT OF ANSWER**

16  **TOM FELKER, Warden,**

17                            Respondent.

18

19                        **INTRODUCTION**

20        Petitioner, Eddie Cole, contends the trial court violated his federal constitutional rights

21  by failing to instruct the jury on self-defense.  Because the United States Supreme Court has not

22  recognized a constitutional requirement that a state court provide self-defense instructions under the

23  circumstances of this case, petitioner's instructional error claim does not provide a basis for habeas

24  relief.  In any event, the Petition should be denied.

25

26                     **STATEMENT OF THE CASE**

27        On April 21, 2004, a San Francisco County jury found petitioner guilty of second degree

28  murder and possession of a firearm by a felon.  Cal. Penal Code §§ 187 & 12021(a)(1).  The jury

Memo of Points and Authorities – *Cole v. Felker* – C 07-5183 JF
                              1

1   also found true enhancements for the personal use of a firearm and for personally discharging a

2   firearm, causing death.  Cal. Penal Code §§ 12022.5(a)(1) & 12022.53(d); CT 227-32.[1]

3            The trial court sentenced petitioner 40 years to life in prison.  CT 238-40.  Petitioner

4   unsuccessfully pursued state direct review.

5            On April 21, 2006, in an unpublished opinion, the California Court of Appeal affirmed the

6   judgment.  Exh. D.

7            On May 31, 2006, petitioner filed a petition for review in the California Supreme Court.

8   Exh. E.  That court denied review on July 12, 2006.  Exh. F.

9            On October 9, 2007, petitioner filed a Verified Petition for a Writ of Habeas Corpus in this

10  Court.  On February 12, 2008, this Court issued an order to show cause as to why relief should not

11  be granted.

12

13                           **STATEMENT OF FACTS**[2]

14           Petitioner shot Karl Young[3] in the back and killed him the evening of May 7, 2003, at the

15  intersection of 6th and Market streets in San Francisco.

16           The parties stipulated that petitioner had a prior felony conviction for possession of

17  marijuana for sale.  RT 344.

18  **David Pugh Sees Petitioner Shoot Mr. Young**

19           David Pugh and a friend took BART from Oakland to San Francisco the evening of the

20  murder.  They got off at the Powell Street station and walked towards the Tenderloin District, where

21

22

23

24           1.  Citations to "CT" and "RT" refer, respectively, to the clerk's and reporter's transcripts

25  of petitioner's state conviction, lodged herewith as respondent's exhibits A and B, respectively.

26           2.  The California Court of Appeal's statement of facts is set forth in that court's unpublished

     opinion, included as exhibit D at 1-3.

27

28           3.  Mr. Young was also known by the nickname "YB," which stood for "Young Blood."  RT

     191, 223.

Mr. Pugh and Mr. Young used to sell drugs.[4/] Mr. Young was one of Mr. Pugh's best friends. They lived together and Mr. Pugh considered him like an older brother. RT 191-92. As Mr. Pugh walked toward the Tenderloin, he saw people he knew and they told him that his cousin and Mr. Young had been "jumped." RT 193-94.

Mr. Pugh started looking for his cousin and Mr. Young. He first saw his cousin, whose face was swollen. He then found Mr. Young, who was visibly upset. RT 194. Mr. Young told Mr. Pugh he had been "jumped" and told him to walk with him to look for the people that had jumped him. Mr. Young wanted to have a fistfight with them. Neither Mr. Pugh nor Mr. Young had a weapon with them.[5/] They began to walk towards 6th and Market, where they saw one of the people who had jumped Mr. Young on the northeast corner. RT 195-96.

Mr. Young had some heated words with the person who had jumped him, and then everyone on the corner, including Mr. Pugh, got into a fistfight.[6/] RT 197. There were eight or nine people in Mr. Pugh's group, and four or five in the other group. RT 211-12. During the fight there was cussing and angry words exchanged on both sides.[7/] RT 216-17. The fight lasted a couple of minutes, then the two groups separated. One of the guys said that they did not have to jump them. Mr. Young replied: "Y'all jumped me." Mr. Young started to walk away. RT 198.

At this point, petitioner, who had not been involved in the fistfight, approached from Golden Gate Avenue. RT 199, 202, 228. As Mr. Young was walking off, he said: "You guys jumped me and we jumped y'all, so we can leave it at that or we can take it to gunplay, whatever."[8/]

---

4. Mr. Pugh testified that there were not really any "turf" problems in selling drugs in the Tenderloin as there was enough demand for everyone's supply. RT 193.

5. Mr. Pugh testified that both he and Mr. Young owned guns, but that they did not have them with them. RT 210.

6. Trina McQueen testified that initially the fight was between Mr. Young and "Mellow," who later testified for the defense. RT 249.

7. Mr. Pugh testified that this was not a "territorial" fight. RT 225.

8. Mr. Pugh also testified that Mr. Young had said: "If you want to take it to gunplay, that's fine" (RT 215), or "You guys jumped me. We jumped y'all. We could squash you. If you guys want to take it to gunplay, then that's fine" (RT 229). A couple seconds passed between Mr.

Memo of Points and Authorities – *Cole v. Felker* – C 07-5183 JF

1    Mr. Young did not direct this comment to any one person, but to the crowd.  RT 198.  Mr. Pugh

2    testified that the "gunplay" was not supposed to happen right then and there.  RT 229.  Mr. Young

3    then turned his back and started walking across Market Street.  Mr. Pugh started walking down the

4    street.  RT 200.

5        Somebody yelled:  "He has a gun."  Mr. Pugh looked to see who had the gun and saw

6    petitioner pointing a handgun at Mr. Young.  RT 200-01, 229.  There were 10 to 15 other people in

7    the same area.  RT 224.  Mr. Young, who had his back turned when petitioner pulled the gun out,

8    also turned to see who had the gun.  He then started running across the street.  RT 201, 214, 229.

9    Petitioner fired two or three shots.[9/]  Mr. Young stumbled, got back up and continued running across

10   the street.  RT 201.  The other people in the area also scattered.  RT 224.  When Mr. Young got to

11   the corner he sat down.  Mr. Pugh ran up to him and told him to get up, but he did not.  RT 201.  Mr.

12   Pugh took Mr. Young into his arms.  RT 215.  He went through Mr. Young's pockets and found no

13   gun.[10/]  RT 217.

14       Mr. Young was taken to the hospital in an ambulance.  Mr. Pugh followed in Mr. Young's

15   car.  RT 202.  Mr. Pugh learned from a doctor that Mr. Young had died.  He was upset and wanted

16   to leave the hospital but was stopped by two police officers, who wanted to talk to him.  Mr. Pugh

17   told the officers, who he assumed were homicide detectives, what he had seen.  He did not, however,

18   want to talk to them and he gave them a false name.  There was a warrant out for Mr. Pugh's arrest

19   and he was worried the detectives would find it.  RT 203-04.  Mr. Pugh told the detectives he needed

20   a break to use the bathroom.  He then left the hospital.  RT 206.

21       Homicide detectives spoke to Mr. Pugh again while he was in custody after being arrested

22   months later.  He gave them another statement at that time.  He was not offered anything in

23

24   Young's comment and the time petitioner began shooting.  RT 220.

25       9.  Mr. Pugh identified petitioner as the shooter in court.  RT 202.  He also identified him
     in a photo lineup.  RT 125-27, 207-08.  Mr. Pugh testified that petitioner was wearing a blue and red
26   jersey.  RT 219.  Mr. Pugh testified that petitioner was shooting "wildly" and he did not think he
     meant to kill Mr. Young.  RT 218.

27       10.  He testified that there were a lot of people in the area, and if he had found a gun,
28   everyone would have seen it.  RT 215, 217.

1  exchange for talking to them.  RT 206, 226-27.

2          Mr. Pugh testified that he was not generally cooperative with the police.  He had a prior

3  felony convictions for possession of narcotics for sale in 1996 and for sale of narcotics in 2000.  Mr.

4  Pugh was also in custody at the time he gave his trial testimony for a probation violation in

5  Alameda, and had a bench warrant in San Francisco for possession of narcotics.  He did not receive

6  anything in exchange for his testimony and had not asked for anything.  RT 204-05, 227.  He

7  testified that based on his experience in possession cases, he expected to get diversion in his San

8  Francisco case.  RT 227-28.  He did not want to testify at the trial, but decided to as a favor to Mr.

9  Young's mother.  RT 208, 227.

10  **Roderick Estrada Witnesses The Murder**

11          Roderick Estrada, an operations manager working as security in a nearby building at 995

12  Market Street, also witnessed the murder.  RT 149.  Mr. Estrada first heard yelling outside.  He

13  looked out and saw a group of 15 to 20 people coming around the corner across Market Street near

14  an "Arkis" store.[11/]  They appeared to be arguing.  Mr. Estrada did not see any blows struck and did

15  not see anyone fighting.  RT 151-53, 165.  When the group began to break up and scatter in different

16  directions, Mr. Estrada saw one African-American male standing with a gun in his hand, pointing

17  it toward the corner.  RT 153-54.  The man walked toward the corner and fired a weapon at another

18  man, who was running away from the shooter into the middle of the intersection.  RT 155-56, 161.

19  The victim was facing away from the shooter when the shooting began.  Mr. Estrada never saw the

20  victim face the shooter.[12/]  RT 161, 178.  The shooter fired three to four shots.  RT 156, 160.  The

21  man running away began to stumble.  No more shots were fired.  After he stumbled, the victim

22  began to change his direction back to the other side of the street.  RT 157.

23          Mr. Estrada did not see any gun other than the shooter's.  He did not hear any shots fired

24  

25          11.  It was evening, but the streetlights were on and Mr. Estrada could see buildings and people.  There was scaffolding on Mr. Estrada's side of the street, but it did not obstruct his view.

26  RT 150-52.

27          12.  Mr. Estrada testified that as he quickly looked back and forth between the victim and the shooter, his attention was very briefly off of the victim (for less than a second each time).  RT

28  167, 178.

1   other than those fired by the shooter.  RT 160.  He did not hear the victim say anything threatening

2   toward the shooter and did not see him make any threatening gestures.  RT 163.

3          Mr. Estrada saw the shooter moving toward Taylor Street and assumed he went up Taylor,

4   although he may have also run up Golden Gate Avenue.  RT 158, 179.

5          Mr. Estrada walked toward the victim, who was on the ground.  There were people

6   gathering around and a man was telling everyone not to touch the victim and telling the victim to

7   "hang in there."  RT 158-59.  No one was very close to the victim and no one was holding him.  RT

8   173.  Mr. Estrada did not see anything in the victim's hands.  RT 158-59.  Mr. Estrada called 911

9   on his cordless phone.  RT 159, 173.  He estimated that the police arrived in less than five minutes.

10  RT 174.  He stayed on the scene until the ambulance arrived.  RT 159.

11         Mr. Estrada was later shown a photo lineup.  He circled three photographs on it, including

12  petitioner's, and identified them as looking like the shooter.[13]  However, he believed the two

13  photographs that were not of petitioner looked the most like the shooter.  RT 125-27, 162-63.  Mr.

14  Estrada was not able to identify petitioner in court.  RT 163.

15     **The Police Respond To The Scene**

16         Officer Gregory Watts was the first police officer on the scene.  He was no more than two

17  blocks away when he received the dispatch and arrived in a matter of minutes.  RT 114.  A crowd

18  of 20 to 30 people was gathering around Mr. Young, who was lying in street on the southeast corner

19  of 6th and Market streets.  RT 101-02, 115.  Mr. Young was lying face down and did not appear to

20  be breathing.  Officer Watts called for an ambulance and backup units.  RT 102.  When Officer

21  Watts arrived, there was a lot of yelling, screaming, pushing and shoving by the crowd, but when

22  people heard the sirens, the screaming and yelling stopped and people began to leave the area.  RT

23  116.  Officer Watts directed the crowd to move away from Mr. Young.  An ambulance arrived on

24  the scene before Officer Watts had a chance to check Mr. Young's vital signs or search him.  RT

25

26  _____

27      13. Mr. Estrada described the shooter as approximately 6' to 6' 1" tall, and of slim build.  He
    was wearing a blue and white leather jacket, dark jeans, and a light colored shirt.  He had a white
28  beanie on his head with tassels hanging down both sides.  Mr. Estrada drew a sketch of the jacket,
    which had a while logo on the back.  RT 154-55.

Memo of Points and Authorities – *Cole v. Felker* – C 07-5183 JF

1    117.

2         **Trina McQueen Sees Petitioner Shoot Mr. Young**

3              Trina McQueen got Officer Watts' attention. Officer Watts recognized Ms. McQeen from

4    his work in the Tenderloin. She seemed nervous and was looking around to see who was watching

5    her talk to Officer Watts, who was in uniform. RT 102. Ms. McQueen hinted to Officer Watts that

6    she had seen the shooter and gave Officer Watts a license plate number from a red Mazda or Toyota

7    hatchback.[14] RT 104. She also described the suspect as a 6' to 6' 1" African-American male, with

8    braids, and wearing a blue and white leather jacket, who she said fled westbound on Golden Gate,

9    towards Jones Street. Officer Watts broadcasted the description of the suspect and the car, and told

10   Ms. McQueen to wait because she would be taken to the Tenderloin station as a witness. RT 105.[15]

11            Homicide inspector James Spillane interviewed Ms. McQueen at the Tenderloin Task

12   Force office. Ms. McQueen was cooperative, but she was nervous and frightened and did not want

13   anyone to see her. RT 123-24. Ms. McQueen identified petitioner in a photo lineup. RT 125-27,

14   243-44. Inspector Spillane tape recorded his interview of Ms. McQueen. RT 355-56.[16]

15            Defense investigator Andrew Kangas also interviewed Ms. McQueen while she was in jail.

16   RT 364. She said she was stoned on crack at the time of the shooting and had not seen anything.

17   Mr. Kangas testified that Ms. McQueen was not trying to give them any information during the

18   interview. RT 365. He speculated that she was nervous. RT 367.

19            Although she was afraid for her life because of recent threats and did not want to testify,

20

21       14. Officer Watts testified that Ms. McQueen had not always been truthful with him in the
22   past during a narcotics investigation. Therefore, if it had been her in trouble, Officer Watts would
     have been skeptical about the information she gave him. He was not, however, skeptical of the
23   unsolicited information she gave him regarding the shooting. RT 113, 121. Officer Watts knew Ms.
     McQueen to be a user or abuser of crack cocaine. RT 113. He did not, however, believe that she
24   was under the influence of narcotics when he spoke with her at the scene. RT 120-21.

25       15. Ms. McQueen did not appear to want to wait, but Officer Watts had two other officers
26   take her to the station. RT 105-06. At trial, Ms. McQueen denied having spoken with an officer at
     the scene. She testified that an officer grabbed her and put her into a car and took her away because
27   she was screaming. RT 242.

28       16. Inspector Spillane also interviewed Ms. McQueen on January 16, 2004. He again tape
     recorded the interview, but discovered after the interview that the tape used was blank. RT 356.

1   Ms. McQueen also testified at trial under subpoena.  RT 230-31, 243.  On the night of the murder

2   she had been getting high and selling drugs on the corner of 6th and Market, but that she was no

3   longer under the influence when the shooting occurred.  RT 236, 245, 262.  Ms. McQueen saw a lot

4   of people standing around.  There was an argument.  A fight broke out, which included Mr. Young,

5   whom she knew.  RT 237-39.  Several guys jumped on one guy.  There were no weapons used.  The

6   fight ended, and everyone split up and began walking away.  She then saw petitioner take a gun from

7   his jacket pocket and shoot into the crowd.[17/]  RT 239-40, 256.  Mr. Young was in the crowd and

8   walking away from the fight.  Ms. McQueen thought Mr. Young's back was turned when petitioner

9   shot him.  RT 239-40.

10       Ms. McQueen ran to Mr. Young and told him that it was going to be okay.  At the same

11   time, she was watched petitioner go up Golden Gate Avenue.  RT 240-41.  Ms. McQueen walked

12   up Golden Gate to see where petitioner had gone.  She lost him for a minute.  She was standing by

13   the parking lot on Golden Gate, when she saw petitioner in a burgundy Mazda driving out of the

14   parking lot.  RT 242.  There was a passenger in the car, but Ms. McQueen could not see him well.

15   RT 263.  She memorized the license plate number of petitioner's car.  RT 242.

16   **Egbert Galindo Sees Petitioner Flee The Scene**

17       Egbert Galindo, a parking attendant at the parking lot on Golden Gate Avenue, testified

18   that petitioner parked a burgundy Toyota Supra in the lot at 6:40 p.m. the night of the shooting.  He

19   recorded the license number and time and took petitioner's keys.  Petitioner returned to his car a few

20   times.  RT 270-74.  After his last trip to the car, Mr. Galindo saw petitioner walk toward 6th Street.

21   Shortly after petitioner left the lot, Mr. Galindo heard three or four gunshots.  Mr. Galindo started

22   to come out of his booth at the parking lot to see what had happened, when he saw petitioner

23   returning to the parking lot.[18/]  Petitioner walked straight to his car.  He was holding something in

24   his left hand, which was inside of his pants as he walked.  RT 276-77.  Mr. Galindo did not see what

25

26       17.  Ms. McQueen testified that petitioner was wearing an expensive blue and white jacket,
    with a lot of writing on the back of it.  RT 239-40.

27

28       18.  The parking lot was approximately 100 yards from the area of the Arkis store on Market
    Street.  RT 89, 360.

Memo of Points and Authorities – *Cole v. Felker* – C 07-5183 JF

1  petitioner had in his hand.  RT 294-95.  Petitioner threw something in his car, but Mr. Galindo could

2  not tell what it was.  Petitioner then yelled for Mr. Galindo to give him his keys, which he did.  RT

3  277, 296.  Petitioner seemed nervous and did not pay.  Another man got into the passenger seat of

4  the car just before petitioner drove away.  RT 278, 298.  Mr. Galindo saw a woman writing down

5  petitioner's car license plate number as petitioner drove away.  RT 278-79.

6         Mr. Galindo identified petitioner in a photo lineup.  He also identified him in court.  RT

7  125-27, 281-82.

8  **Crime Scene Investigation**

9         Inspector Raymond Gee, a crime scene investigations inspector, was called to the scene.

10  RT 72.  He located three spent shell casings which had been fired from a semiautomatic pistol.  RT

11  78, 85.  Inspector Yee testified that the gun was fired from the general vicinity of the Arkis store on

12  the northeast corner of 6th and Market streets.  RT 87, 359.  He also collected clothing, apparently

13  cut off of Mr. Young by the paramedics.  RT 75-80.

14  **The Autopsy**

15         Dr. Boyd Stephens, the chief medical examiner for San Francisco, was present during Mr.

16  Young's autopsy.  He testified Mr. Young was killed by a gunshot wound, the bullet from which

17  traveled through the right side of his back and lodged just above his left armpit.  RT 54-55.  There

18  were a number of possible things Mr. Young could have been doing when he was shot.  One

19  possibility was that Mr. Young was fleeing from the shooter and bent ducking.  RT 56.  Another was

20  that Mr. Young was bending and turning to the right.  RT 64.  Another was that the shooter was off

21  to Mr. Young's right, in which case Mr. Young would have been bending, but not turning to his

22  right.  RT 69.  Mr. Young was 31 years old at the time he was killed.  He was 5' 10" tall and weighed

23  228 pounds.  RT 54.  He was healthy and very muscular.  RT 70.  Mr. Young had a number of

24  tattoos, including ones on his left and right shoulders.[19/]  RT 65-66.

25

26  _____

27         19. Mr. Pugh testified that Mr. Young had one tattoo on his shoulder and one on his forearm.
The one on his forearm could be seen if he wore a short-sleeve shirt and depicted a guy smoking a
28  "blunt" with a gun in his hand.  RT 221-22.  According to Mr. Pugh, this image did not indicate that
Mr. Young used a gun.  RT 223.

Memo of Points and Authorities – *Cole v. Felker* – C 07-5183 JF

**Petitioner's Arrest**

When Officer Watts reported for work the day after the shooting, he was shown a photograph of the suspect and given the licence plate number to a red Toyota. The license number was almost an exact match to the one given by Ms. McQueen. RT 107. Around 10:00 p.m. that evening, Officer Watts saw a red Toyota with a driver who looked like the suspect and an African-American woman passenger. RT 108. Officer Watts called for backup because he did not want to make the traffic stop in his unmarked car. RT 109. A marked car arrived and made the stop. Petitioner and a female passenger exited the car with their hands in view as requested. RT 110.

Officer Watts looked inside petitioner's car and waited with it until it was towed to a locked compound as authorized by the homicide inspectors. RT 111. Officer Watts saw articles of clothing inside petitioner's vehicle, including a jacket. He did not remember the color of the jacket he saw, but did not think it was blue and white. RT 118.

Inspector Spillane was also called to the scene of the arrest and looked inside petitioner's car. He saw a black leather jacket and a multicolored jacket of blue, black, red, and possibly yellow, in the backseat. RT 133. After obtaining a search warrant for the car, Officer Spillane searched it and took the multi-colored jacket in as evidence.[20] RT 134. No expended cartridges or holsters were found in the vehicle. RT 144.

**Gunshot Residue Found On The Jacket**

Linda Abuan, a forensic scientist specializing in gunshot residue analysis, tested the right and left cuffs of the jacket found in petitioner's car for gunshot residue. She found gunshot residue particles on both cuffs. RT 304, 310-13, 316. She further testified as to the protective procedures taken at her lab when testing items for gunshot residue. RT 317.

Ms. Abuan testified that the presence of gunshot residue indicated that the person wearing the jacket fired a gun, was in close proximity to a gun as it was fired, or that the jacket came into

---

20. The jacket found in petitioner's car had blue sleeves and a dark blue leather body. It had a white decal on the back with a figure and a couple cat heads with the label "Akademiks." The detail was primarily white with some red. On the front, there was a white figure with the word "Judo" in red on one side and a blue "A" with the word "Akademiks" in blue and red below it on the other. RT 138.

1  contact with something that had gunshot residue particles on its surface which were transferred to

2  the jacket.  RT 313, 318-20.  She also explained that she could not determine how long the gunshot

3  residue particles had been on the jacket before she tested it.[21]  RT 316, 318.

4        The jacket was checked out for processing twice, once by the defense and once by the

5  prosecution, to be tested for gunshot residue.  RT 144.  Inspector Spillane testified that when the

6  jacket was handled, it was handled with gloves, and when it was examined in the property room,

7  butcher paper was put on the table.  RT 146, 354.  Items in evidence were looked at and kept

8  separately.  RT 146.  Defense counsel showed Inspector Spillane a photograph of the jacket being

9  held up.  In the photo, there is no butcher paper on the table in the property room.  RT 147; Defense

10  Exh. C.  Inspector Spillane did not recall whether the jacket was placed on the table.  Inspector

11  Spillane was shown photographs of  the victim's shirt, which was on the table without any butcher

12  paper on it.  RT 354.

13        Defense investigator Andrew Kangas testified that he viewed evidence in the property

14  room.  He saw petitioner's jacket (People's Exh. 12-C) on the property table and there was no

15  butcher paper on the table at the time.  RT 364.  He also testified that he was not wearing gloves

16  when he photographed the jacket, although he had adjusted the jacket on the table.  RT 366.

17  **Defense Case**

18        Matthew Bell ("Mellow") testified for the defense.  Mr. Bell acknowledged that he had

19  a prior conviction for the sale of marijuana and that he had a stay-away order from the area of 5th

20  and Market streets.  RT 378, 388.  Mr. Bell had grown up with petitioner and was his friend.  RT

21  378.  Mr. Bell testified that he wanted to help petitioner "any possible way necessary."  RT 411.

22        The day of the shooting, Mr. Bell saw Mr. Young and his friend Don B. get into a verbal

23  altercation on 5th and Market streets.  Mr. Bell did not get involved in that argument.  RT 379-80.

24  Later, Mr. Young returned to the area of 5th and Market streets with three friends and "jumped" Don

25  B., who was by himself.  Mr. Bell helped Don B., but did not fight with Mr. Young.  RT 380-81.

26  _____

27        21.  No gunshot residue was found on petitioner's hands, which were tested over 24 hours
    after the shooting.  RT 347, 348.  Gunshot residue usually could only be found for approximately
28  four hours on a person's hands.  RT 310, 348.

1    Later, Mr. Young approached Mr. Bell between Turk and Market streets.  Mr. Young and Mr. Bell

2    got into an argument.  Mr. Young threatened: "I should kill you right now."  Mr. Bell saw a small-

3    caliber pistol in Mr. Young's right hand.  RT 381.  Mr. Bell was kind of scared but had his friends

4    with him, so that helped make him more comfortable.  He wanted to run but did not want to get shot

5    in the back.  Mr. Young did not point the gun at Mr. Bell and did not try to shoot him.  RT 382.

6          Mr. Bell testified that the last encounter he had with Mr. Young was on 6th and Market

7    streets, where he was standing with petitioner and another friend named Buddy.  Mr. Young

8    approached them with 15 to 20 other people.  Mr. Bell and Mr. Young began arguing.  Mr. Young

9    then hit Mr. Bell, causing Mr. Bell to drop to the ground, where more than five people continued to

10   hit and kick him.  RT 382-83, 395.

11         Petitioner came to Mr. Bell's aid and lifted him.  RT 383, 395-96.  Mr. Bell testified that

12   petitioner was able to break up the fight because petitioner was not hurting anyone and the assailants

13   did not know who petitioner was.  RT 405.  Mr. Young then hit petitioner in the jaw, causing

14   petitioner to stumble back.  RT 384.  Petitioner did not hit Mr. Young back and the fight ended.  RT

15   397-98.  Petitioner asked Mr. Young why he hit him and said he should not have done that.  Mr.

16   Young walked away, towards the bus island and said: "Do you want to take this to gunplay."  RT

17   385, 398.  On direct examination, Mr. Bell testified that when he heard this, he ran up Golden Gate.

18   RT 385.  On cross-examination, he elaborated that he heard Mr. Young say this and saw him reach

19   down.  He thought Mr. Young might be reaching for a gun again, so he ran.  RT 398.  Mr. Bell then

20   heard gunshots, but did not see who fired them.  RT 386.  Mr. Bell did not see petitioner with a gun

21   that day, however, he ran before petitioner did, and admitted that petitioner could have shot Mr.

22   Young.  RT 387, 403.  Petitioner ran up behind Mr. Bell.  They went to petitioner's car, and quickly

23   left the area.  RT 386.

24         Mr. Bell testified that petitioner was wearing a white t-shirt.  RT 386.  He also testified

25   that petitioner always "sags" his pants, never wears a belt, and always kept his hands in his pants

26   when he walked.  RT 387.

27         Officer Eddie Hagan testified that on one occasion, over a year before the shooting, he had

28   searched Mr. Young's person, his residence, and his car.  He did not find a gun, but found 50 bullets

1    at his residence.  RT 413-14.

2

3                            **STANDARD OF REVIEW**

4            A federal court may grant a writ of habeas corpus to a state prisoner only if the state

5    court's rulings "resulted in a decision that was contrary to, or involved an unreasonable application

6    of, clearly established Federal law, as determined by the Supreme Court of the United States" or

7    were "based on an unreasonable determination of the facts in light of the evidence presented" in the

8    state courts.  28 U.S.C. § 2254(d).  Under the "contrary to" clause, a state court's decision is

9    contrary to federal law if it "contradicts the governing law set forth in our cases" or if it "confronts

10   a set of facts that are materially indistinguishable from a decision of this Court and nevertheless

11   arrives at a result different from our precedent."  *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000).

12   That test does "not require citation of our cases—indeed, it does not even require *awareness* of our

13   cases, so long as neither the reasoning nor the result of the state-court decision contradicts them."

14   *Early v. Packer*, 537 U.S. 3, 8 (2002) (per curiam).  The ultimate controlling authority is the holding

15   of the Supreme Court's cases at the time of the relevant state-court decision, not the dicta.  *Carey*

16   *v. Musladin*, 549 U.S. 70, 127 S. Ct. 649, 653 (2006).  The state courts are presumed to "know and

17   follow the law," and the standard for evaluating state-court rulings, which are given the "benefit of

18   the doubt," is "highly deferential."  *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam).  In

19   order to warrant habeas relief, the state court's application of clearly established federal law must

20   be not merely erroneous, incorrect, or even "clear error," but "objectively unreasonable."  *Lockyer*

21   *v. Andrade*, 538 U.S. 63, 76 (2003).  It is the habeas petitioner's burden to make that showing.

22   *Visciotti*, 537 U.S. at 25.  Also, state court factual determinations are presumed correct unless

23   rebutted by clear and convincing evidence.  28 U.S.C. § 2254(e)(1).

24           Even if the state court's ruling is contrary to or an unreasonable application of Supreme

25   Court precedent, that error justifies overturning the conviction only if the error had "substantial and

26   injurious effect or influence in determining the jury's verdict."  *Brecht v. Abrahamson*, 507 U.S.

27   619, 637 (1993).  The *Brecht* standard applies to all § 2254 cases, regardless of the type of harmless

28   error review conducted by the state courts.  *Fry v. Pliler*, ___ U.S. ___, 127 S. Ct. 2321 (2007).

Memo of Points and Authorities – *Cole v. Felker* – C 07-5183 JF

1

2                                            **ARGUMENT**

3

4           **PETITIONER'S FEDERAL CONSTITUTIONAL RIGHTS WERE NOT
            VIOLATED BY THE TRIAL COURT'S REFUSAL TO INSTRUCT THE**

5           **JURY PURSUANT TO HIS PROPOSED INSTRUCTIONS ON
            COMPLETE AND IMPERFECT SELF-DEFENSE**

6

7           Petitioner contends the trial court violated his federal constitutional rights by failing to

8   instruct the jury pursuant to his proposed instructions on complete and imperfect self-defense.

9   Because the United States Supreme Court has not held that the Constitution includes the right to

10  instructions on affirmative defenses, the California Court of Appeal's decision could not have been

11  contrary to, or involved an unreasonable application of, federal law.  Alternatively, petitioner is not

12  entitled to relief because the California Court of Appeal reasonably determined the evidence did not

13  warrant instruction on this defense.

14  **A.    Petitioner's Claim Does Not Provide A Basis For Relief Under The AEDPA**

15          Petitioner has cited no Supreme Court case establishing a constitutional right to self-

16  defense instructions under the circumstances of this case.  Nor can he.  The Supreme Court has

17  explained there is *no* constitutional right to jury instructions on an affirmative defense.  *Gilmore v.*

18  *Taylor*, 508 U.S. 333, 344 (1993).  Thus, not only is federal habeas relief precluded in this AEDPA

19  case, but application of such a rule to grant habeas relief violates the anti-retroactivity provisions

20  of *Teague v. Lane*, 489 U.S. 288, 299-300 (1989).

21          The Supreme Court has recognized that "'the Constitution guarantees criminal defendants

22  "a meaningful opportunity to present a complete defense."'"  *Crane v. Kentucky*, 476 U.S. 683, 690

23  (1986).  But the Court explicitly limited this federal constitutional right to the improper exclusion

24  of defense evidence; the court has not extended it to the failure to present state-law instructional

25  theories.  *Gilmore v. Taylor*, 508 U.S. at 341-42.  As a matter of federal statutory and common law,

26  a criminal defendant is entitled to instructions on defenses "'for which there exists evidence

27  sufficient for a reasonable jury to find in his favor.'"  *Mathews v. Unites States*, 485, U.S. 58, 63

28  (1988); Fed. R. Crim. Proc. § 31(c).  This case, however, arises under the AEDPA, and decisions

1   involving the high court's supervisory power or the Federal Rules of Criminal Procedure are

2   irrelevant.  *Early v. Packer*, 537 U.S. 3, 10 (2002).  A close inspection of *Mathews* and the case it

3   relied upon, *Stevenson v. United States*, 162 U.S. 313 (1896), demonstrates that they are not based

4   on the federal Constitution.  In *Mathews*, the Court stated, "As a general proposition a defendant is

5   entitled to an instruction as to any recognized defense for which there exists evidence sufficient for

6   a reasonable jury to find in his favor."  *Mathews*, 485 U.S. at 63.  In so stating, however, the Court

7   did not indicate that such proposition was grounded in the United States Constitution.[22]  *See*

8   *Mathews*, 485 U.S. at 63.  As the Supreme Court pronounced in *Texas v. Cobb*, 532 U.S. 162, 169

9   (2001), "'[c]onstitutional rights are not defined by inference from opinions which did not address

10  the question at issue.'"

11          That *Mathews* did not address the constitutional issue was made abundantly clear in

12  *Gilmore*, which came five years after *Mathews*, when the Court flatly rejected the argument that the

13  right to present a defense includes the right to have the jury consider it, and that confusing

14  instructions on state law which prevent a jury from considering an affirmative defense therefore

15  violate due process.  *Gilmore v. Taylor*, 508 U.S. at 344.  In *Gilmore*, a habeas petitioner claimed

16  "the jury instructions given at his trial interfered with his fundamental right to present a defense."

17  *Gilmore*, 508 U.S. at 343.  The Court disagreed, explaining:

18          We have previously stated that the Constitution guarantees criminal defendants a
            meaningful opportunity to present a complete defense.  But the cases in which we have
19          invoked this principle dealt with the exclusion of evidence or the testimony of defense
            witnesses.  None of them involved restrictions imposed on a defendant's ability to present
20          an affirmative defense.  Drawing on these cases, respondent argues that the right to
            present a defense includes the right to have the jury consider it, and that confusing
21          instructions on state law which prevent a jury from considering an affirmative defense
            therefore violate due process.  But such an expansive reading of our cases would make a
22          nullity of the rule . . . that instructional errors of state law generally may not form the basis
            for federal habeas relief.  And the level of generality at which respondent invokes this line
23          of cases is far too great to provide any meaningful guidance for purposes of our *Teague*
            inquiry.
24
    *Id*. at 343-44 (citations and footnote omitted).  Had *Mathews* or any other Supreme Court case
25
    actually established a federal constitutional requirement that the jury be instructed on a defense
26
    theory, the Court in *Gilmore*, we believe, would not have rejected the habeas petitioner's argument.
27

28          22.  *Mathews* involved a direct appeal by a federal criminal defendant.

    Memo of Points and Authorities – *Cole v. Felker* – C 07-5183 JF

1   But it did, and did so because there is no such federal constitutional entitlement.

2         Consequently, because the Supreme Court has not held that the Constitution includes any

3   right to instructions on affirmative defenses, the California Court of Appeal's determination that

4   petitioner was not entitled to instructions on self-defense does not provide a basis for habeas relief

5   under AEPDA.  *See Sosa v. Jones*, 389 F.3d at 645; *see also Carey v. Musladin*, 127 S. Ct. at 654

6   ("Given the lack of holdings from this Court regarding the potentially prejudicial effect of

7   spectators' courtroom conduct of the kind involved here, it cannot be said that the state court

8   'unreasonabl[y] appli[ed] clearly established Federal law.' § 2254(d)(1).").  *But see Beardslee v.*

9   *Woodford*, 358 F.3d 560, 577-78 (9th Cir. 2003) (pre-AEDPA case holding failure to instruct on the

10  defense theory of the case is reversible error if the theory is legally sound and evidence in the case

11  makes it applicable); *Bradley v. Duncan*, 315 F.3d 1091, 1098 (9th Cir. 2002) (failure to instruct on

12  entrapment was not simply a violation of state law; it also affected petitioner's due process rights).[23]

13  **B.   The California Court Of Appeal Reasonably Rejected Petitioner's Instructional Error**
        **Claim**
14

15        Assuming that the failure to instruct on self-defense could provide a basis for relief under

16  the AEDPA, petitioner's claim still fails.  The Ninth Circuit has held that due process requires a trial

17  court to instruct the jury on a recognized defense "'for which there exists evidence sufficient for a

18  reasonable jury to find in his favor.'"  *Bradley v. Duncan,* 315 F.3d at 1098 (quoting *Mathews v.*

19  *United States,* 485 U.S. at 63).  But no federal authority requires a state trial court to instruct on a

20  defense not supported by the evidence.  That is what the California Court of Appeal correctly

21  determined was the situation here.[24]

22        The California Court of Appeal summarized the law of self-defense in California as

23

24        23.  Circuit authority will not support reversal under 28 U.S.C. § 2254(a)(1); *Holgerson v.*
        *Knowles*, 309 F.3d 1200, 1202-03 (9th Cir. 2002); see *Duhaime v. Ducharme*, 200 F.3d 597, 602-03
25      (9th Cir. 2000).

26        24.  This Court must look to the last reasoned state court decision as the basis for the state
        court judgment.  *Avila v. Galaza*, 297 F.3d 911, 918 (9th Cir. 2002).  Here, the last reasoned
27      decision in the state court was that of the California Court of Appeal which denied petitioner's direct
        appeal on this issue.
28

1 | follows:

2 | "For an assault to be in self-defense, the defendant must actually and reasonably believe in the need to defend." (*People v. Jefferson* (2004) 119 Cal.App.4th 508, 518.) Further,

3 | the defendant must actually and reasonably believe that the threat of physical harm is "imminent." (*People v. Hayes* (2004) 120 Cal.App.4th 796, 803 (*Hayes*); *De Leon, supra,*

4 | 10 Cal.App.4th at pp. 824-825; *People v. Uriarte* (1990) 223 Cal. App. 3d 192, 197, 272 Cal. Rptr. 693 (*Uriarte*); *People v. Aris* (1989) 215 Cal. App. 3d 1178, 1186, 264 Cal.

5 | Rptr. 167 (*Aris*).)  "Imminence is a critical component" of a theory of self-defense.

6 | (*People v. Humphrey* (1996) 13 Cal.4th 1073, 1094.)    Even the unreasonable self-defense doctrine demands proof of a subjectively honest, if unreasonable, belief in the need to engage in lethal force to prevent imminent peril to life or serious injury. (*People v. Flannel* (1979) 25 Cal.3d 668, 674,

7 | 160 Cal. Rptr. 84; *Aris, supra,* 215 Cal. App. 3d at p. 1186.) "'It is the honest belief of *imminent peril* that negates malice . . . .' [Citations.]" (*Hayes, supra,* 120 Cal.App.4th at p. 803, italics

8 | added.) The unreasonable defense doctrine "recognizes that in order to warrant a conviction of manslaughter rather than murder, the defendant must honestly (if unreasonably) believe that *serious*

9 | *injury is imminent* and that lethal force is necessary." (*Uriarte, supra,* 223 Cal. App. 3d at p. 197, italics added.) The unreasonable defense doctrine "is narrow. . . . Fear of future harm-no matter how

10 | great the fear and no matter how great the likelihood of the harm-will not suffice. The defendant's fear must be of *imminent* danger to life or great bodily injury. "'The peril must appear to the

11 | defendant as immediate and present and not prospective or even in the near future. *An imminent peril is one that, from appearances, must be instantly dealt with.*" . . . [¶] This definition of imminence

12 | reflects the great value our society places on human life.' [Citation.]" (*In re Christian S.* (1994) 7 Cal.4th 768, 783, italics added by the *Christian S.* court; see also *People v. Rodriguez* (1997) 53

13 | Cal.App.4th 1250, 1269 (*Rodriguez*); *People v. Sekona* (1994) 27 Cal.App.4th 443, 449.)

14 | Exh. D at 4-5.

15 | The Court of Appeal determined the evidence in this case did not warrant instructions on

16 | self-defense under the above-cited authorities.  In reaching this conclusion, the Court of Appeal

17 | found "[t]he circumstances of the shooting" were " inconsistent with any fear of imminent harm on

18 | the part of appellant." Exh. D at 5. Specifically, the court found:

19 | Although appellant and the victim had recently engaged in fisticuffs, that encounter had ended. The victim was walking away, with his back turned, and there was no evidence

20 | that appellant was faced with any immediate or imminent threat. The fact that the victim had made a comment that could be interpreted as a threat to engage in a shootout with

21 | appellant *at some unspecified later time* did not amount to a threat of *imminent* harm. Most critically, there is no evidence that before appellant began shooting, *appellant* saw

22 | or thought he saw any weapon in the victim's possession, or saw or thought he saw that the victim was reaching for any weapon.  There was some evidence that the victim may

23 | have bent over or reached down around the time of the shooting. Bell testified he thought Young may have been reaching for a gun at this point. However, he also testified that he

24 | had seen Young with a gun earlier in the day. If believed, that earlier observation would certainly help to explain *Bell's* belief that Young was reaching for a gun. Yet, there was

25 | no evidence that appellant made that earlier observation or knew of it at the time of the shooting.  At the time of the shooting, the victim was not running towards or attacking

26 | appellant, or anyone else.  In fact, the victim was walking away from him. We therefore conclude that the requested self-defense instructions were not supported by substantial

27 | evidence. (See *De Leon, supra*, 10 Cal.App.4th at pp. 824-825.)

28 |

Memo of Points and Authorities – *Cole v. Felker* – C 07-5183 JF

17

1    Exh. D at 5.[25/]

2         The record amply supports the Court of Appeal's findings regarding the dearth of evidence

3    that petitioner actually and/or reasonably believed in the need to defend himself based on a fear of

4    imminent harm.  Petitioner asserts that the instructions were supported by evidence that there had

5    been a fight between Mr. Young and Mr. Bell immediately prior to the shooting, that in breaking

6    up the fight Mr. Young had punched petitioner in the jaw, and that Mr. Young and petitioner had

7    exchanged argumentative words.  He further points to Mr. Bell's testimony that as Mr. Young

8    walked away from the fight, he heard Mr. Young say: "[d]o you want to take this to gunplay" (RT

9    385, 398) and saw him reach down.  Mr. Bell testified that because he had seen Mr. Young with a

10   gun earlier in the day, he thought Mr. Young might be reaching for a gun.  RT 398.

11        There was no evidence, however, that *petitioner* had seen Mr. Young with a gun earlier

12   in the day.  Nor was there any evidence that *petitioner* saw Mr. Young reach down.  Finally, there

13   was no evidence that *petitioner* feared Mr. Young could be reaching for a gun.  For these same

14   reasons, the coroner's testimony that Mr. Young could have been bending and turning when he was

15   shot, provides no evidence that petitioner saw Mr. Young turn before he fired the first shot, or that

16   if petitioner saw Mr. Young turn, this motion made petitioner actually fear an imminent harm.

17        Petitioner also argues the self-defense instructions were supported by evidence that Mr.

18   Young was muscular.  That Mr. Young was muscular, however, does not support a self-defense

19   instruction where both the defense and prosecution witnesses testified that Mr. Young was walking

20   away when he was shot.  As such the self-defense theory was premised upon an asserted fear of

21   being shot – not being physically overpowered.

22        For these same reasons, the state court's finding that the evidence in this case was

23   insufficient to support the proposed self-defense instructions was not contrary to, nor did it involve

24   an unreasonable application of, clearly established Federal law, as determined by the Supreme Court

25

26   _____

27        25.  Petitioner attempts to bolster his argument by asserting that the trial court mistakenly
     believed petitioner was required to testify as a condition to warranting self-defense instructions.  The
28   record does not support this assertion.  The trial court found only that Bell's testimony did not
     provide sufficient evidence to warrant the requested self-defense instructions.  RT 422.

1    of the United States.  Nor was the court's decision "based on an unreasonable determination of the

2    facts in light of the evidence presented" in the state courts.  28 U.S.C. § 2254(d).

3    **C.    Any Error Was Harmless**

4            Even assuming the trial court violated petitioner's federal constitutional rights in failing

5    to instruct the jury on self-defense, the violation did not have a "'substantial and injurious effect or

6    influence in determining the jury's verdict.'"  *Brecht v. Abrahamson*, 507 U.S. at 623; *see Fry v.*

7    *Pliler*, 127 S. Ct. 2321, 2328 (2007) (*Brecht* standard applies on habeas regardless of whether the

8    state court found error and evaluated it under the federal harmless error standard).

9            The is virtually no possibility that the jury would have believed petitioner's frivolous

10   claim of self-defense.  By all accounts, the fistfight was over (RT 153-54, 198, 239) and Mr. Young

11   was walking away (RT 155-56, 161, 200, 240) when petitioner fired a minimum of three shots at

12   him (RT 78, 85).  Moreover, Mr. Young was unarmed at the time of the shooting.  (RT 160, 215,

13   217.)  Accordingly, any error was harmless and does not warrant habeas relief.

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Memo of Points and Authorities – *Cole v. Felker* – C 07-5183 JF

1

## CONCLUSION

2

3
        Accordingly, respondent respectfully requests that the petition for writ of habeas corpus

be denied with prejudice.

4

5

6
        Dated:  July 9, 2008

7

8
                        Respectfully submitted,

9
                        EDMUND G. BROWN JR.
                        Attorney General of the State of California

10
                        DANE R. GILLETTE
                        Chief Assistant Attorney General

11
                        GERALD A. ENGLER
                        Senior Assistant Attorney General

12
                        GREGORY A. OTT
                        Deputy Attorney General

13

14
                        **/s/ Lisa Ashley Ott**
                        LISA ASHLEY OTT
                        Deputy Attorney General

15
                        Attorneys for Respondent

16

17

18

19

20

21

22

23

24

25

26

27

28