**E-Filed 3/31/2011**

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| EDDIE COLE,<br><br>　　　　　　Petitioner,<br><br>　v.<br><br>TOM FELKER, Warden,<br><br>　　　　　　Respondent. | Case Number 5:07-cv-05183-JF<br><br>ORDER[1] DENYING PETITION FOR WRIT OF HABEAS CORPUS |

Petitioner Eddie Cole ("Cole") seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254. For the reasons discussed below, the Court concludes that Cole is not entitled to relief and will deny the petition.

**I. FACTUAL BACKGROUND**[2]

David Pugh testified at Cole's trial that, on May 7, 2003, he traveled from Oakland to San Francisco with his friend "T," planning to spend the evening selling drugs in the Tenderloin. As

---

[1] This disposition is not designated for publication in the official reports.

[2] The factual background is taken from the unpublished opinion of the California Court of Appeal filed April 21, 2006.

they walked the streets, Pugh heard that two of his associates from Oakland had recently been "jumped" by assailants on the street. One of the men who had been jumped was the eventual murder victim in this case, Karl Young; the other person was a man named "Tone."

When Pugh and T found Young and Tone, Pugh saw that Tone's face was swollen. The four men began looking for the men who had jumped Young and Tone. They picked up others along the way, so that they had a group of eight or ten men with them by the time they got to Sixth and Market. Young saw the man who had jumped him, Matthew Bell, standing on the corner with a smaller group of four or five people.

The men fought one another for a few minutes. When the fistfight came to an end, the two groups of men separated, while exchanging angry words. Bell protested to Pugh and Young that they should not have jumped him, and Young replied, "Y'all jumped me." At this point, Pugh noticed that another man, whom he subsequently identified as Cole, had walked up to join Bell and his friends.

Young started to walk away, saying, "You guys jumped me and we jumped y'all, so we can leave it at that or we can take it to gunplay, whatever." After Young and Pugh had turned their backs to walk away, Pugh heard someone yell a warning, "He has a gun." Pugh turned and saw Cole aiming a hand gun at Young. Young also turned to look, and then started to run away across the street. Cole fired two or three times, hitting Young and killing him. Afterwards, Pugh searched Young and found Young had not been armed.

Pugh was a convicted felon who was on probation at the time of this event. When police contacted him at the hospital in order to get his statement, Pugh gave a false name and later slipped away from the police after claiming that he needed to use the bathroom. He was contacted again by the police when he came into custody at a later date.

Autopsy evidence showed that Young died from a single gunshot to the small of the back on the right side. The angle of the bullet suggested that Young might have been bending down to duck, or possibly reaching down, at the time he was shot. Young was big and muscular, and he had a tattoo on his forearm, showing a gun. Three expended shell casings were recovered from the intersection.

1    Matthew Bell, also a convicted felon, testified for the defense. He and Young had been
2 involved in arguing or fighting all day. First, Young had an argument with Bell's friend, Don
3 Beef. Young came back later with some friends and jumped Beef. Later, Young got into an
4 argument with Bell, complaining that Bell had beaten up one of Young's friends. Young
5 threatened to kill Bell, and Bell saw Young with a gun in his hand.

6    Finally, there was the fight at the corner of Sixth and Market. Young and his friends
7 began beating up Bell. Cole, whom Bell has known for many years, came to Bell's aid. As he
8 did so, Young punched Cole in the jaw, and Cole stumbled back. Young and Cole exchanged
9 words. As Young walked away, he said, "Do you want to take this to gunplay." Bell saw Young
10 reach down. Thinking that Young might have a gun, Bell ran away. He then heard shots. Cole
11 and Bell fled in Cole's car.

## II. PROCEDURAL BACKGROUND

A jury convicted Cole of second degree murder (Cal. Pen. Code § 187) and possession of a fireman by a felon (Cal. Pen. Code § 12021(a)(1)). The jury also found true facts giving rise to enhancements for personal use of a firearm (Cal. Pen. Code § 12022.5(a)(1)) and for personally discharging a firearm, causing death (Cal. Pen. Code § 12022.53(d)). Cole was sentenced to a prison term of forty years to life.

On appeal, Cole argued that the trial court erred by refusing to give jury instructions on complete and imperfect self-defense. With respect to complete self-defense, Cole requested that the court give CALJIC 5.51, Reporter's Transcript ("RT") 421, which provides that an individual has a right of self-defense if a reasonable person in the same circumstances would fear that he was about to suffer bodily injury, and that the "right of self-defense is the same whether the danger is real or merely apparent," CALJIC 5.51.[3] With respect to imperfect self-defense, Cole requested that the court give CALJIC 8.40, defining voluntary manslaughter, RT 421, and in particular the portion of the instruction stating that "[t]here is no malice aforethought if the

---

[3] Cole also requested that the trial court instruct with CALJIC Nos. 5.32 (use of force in defense of another) and 5.52 (self-defense - when danger ceases). RT 421.

killing occurred . . . in the actual but unreasonable belief in the necessity to defend oneself or another person against imminent peril to life or great bodily injury," *see* CALJIC 8.40.

The trial court rejected the proposed self-defense instructions on the following grounds:

> I believe the testimony that Mr. Bell provides gives the Court some reason to entertain the instructions relating to involuntary manslaughter.  The Court does not find that instructions relating to self-defense or defense of others is appropriate, because those instructions appear to require evidence of what the defendant believed in regard to those issues, and we do not have that evidence, and I don't believe Mr. Bell's evidence can be imputed to the defendant.  So I am not going to give the self-defense or defense of others instructions at this time.

RT 422.  The trial court did give CALJIC 8.40, but deleted the language addressing self-defense. RT 426.

The appellate court affirmed Cole's conviction in an unpublished opinion, holding expressly that "the trial court did not err by refusing to give the requested self-defense instructions." *People v. Cole*, 2006 WL 1047024, at *4 (Cal. App. 1st Dist. April 21, 2006). Cole's his petition for review was denied on July 12, 2006.  Cole timely filed the instant habeas petition on October 9, 2007, asserting that the trial court's refusal to give jury instructions on self-defense resulted in a deprivation of his federal constitutional rights.

### III. LEGAL STANDARD

When, as here, a federal habeas petition is filed after the effective date of the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"),[4] the petitioner may prevail only by demonstrating that adjudication of his or her claims in the state courts "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *Musladin v. Lamarque*, 555 F.3d 830, 834 (9th Cir. 2009) (citing 28 U.S.C. § 2254(d)).

"A state court decision will be 'contrary to' federal law if it 'applies a rule that contradicts

---

[4] AEDPA became effective on April 24, 1996.  *Rossum v. Patrick*, 622 F.3d 1262, 1270 (9th Cir. 2010).

4

the governing law set forth in [Supreme Court] cases' or 'confronts a set of facts that are materially indistinguishable from' a Supreme Court case yet reaches a different result." *Id*. (quoting *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000)). "It will involve an 'unreasonable application of' federal law only if it is 'objectively unreasonable.'" *Id*. (quoting *Williams*, 529 U.S. at 409). The state court decision tested under these standards is the decision of the highest state court to provide a reasoned decision on the merits. *Id*. at 834.

## IV. DISCUSSION

In this case, the California Court of Appeal was the highest state court to to provide a reasoned decision on the merits of Cole's claim. The question is whether the appellate court's decision was contrary to, or involved an unreasonably application of, Supreme Court authority.

"Whether rooted directly in the Due Process Clause of the Fourteenth Amendment, or in the Compulsory Process or Confrontation clauses of the Sixth Amendment, the Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense." *Crane v. Kentucky*, 476 U.S. 683, 690 (1986) (internal quotation marks and citations omitted). "As a general proposition a defendant is entitled to an instruction as to any recognized defense for which there exists evidence sufficient for a reasonable jury to find in his favor." *Mathews v. United States*, 485 U.S. 58, 63 (1988).

Respondent asserts that the holding of *Mathews* is not compelled by the Constitution, and thus that Cole would not be entitled to federal habeas relief even if the state appellate court's decision were contrary to *Mathews*. Cole, of course, disagrees. Resolution of this dispute is not as straightforward as one might imagine. At least one panel of the Ninth Circuit Court of Appeals has reasoned as follows:

> The Supreme Court has held that a federal criminal defendant who denies one or more elements of the offense is entitled to an entrapment instruction if there is sufficient evidence from which a reasonable jury could find entrapment. *Mathews v. United States*, 485 U.S. 58, 62, 108 S.Ct. 883, 886, 99 L.Ed.2d 54 (1988). Nevertheless, this holding is not compelled by the Constitution.

*Bueno v. Hallahan*, 988 F.2d 86, 88 (1993). The panel went on to deny the petitioner's federal due process claim based upon the trial court's refusal to instruct on the entrapment defense unless the petitioner admitted all of the elements of each offense. *Id*. The panel cited *Jammal v.*

1  *Van de Kamp*, 926 F.2d 918, 919 (9th Cir. 1991) for the proposition that "on federal habeas we
2  may only consider whether the petitioner's conviction violated constitutional norms." *Id*.
3  More recent Ninth Circuit cases have treated *Mathews* as clearly established Supreme
4  Court authority for purposes of federal habeas review. *See Drew v. Scribner*, 252 Fed. Appx.
5  815, 817-18 (9th Cir. 2007) (citing *Mathews* for the proposition that "due process requires
6  criminal defendants be afforded a meaningful opportunity to present a complete defense. This
7  right includes the right to have the jury instructed on the theory of defense, where the defendant
8  puts forth sufficient evidence for a reasonable juror to find in his favor and he requests such an
9  instruction."); *Lockridge v. Scribner*, 190 Fed. Appx. 550, 551 (9th Cir. 2006) (citing *Crane* and
10 *Mathews* in holding that "the trial judge's refusal to instruct Lockridge's jury on the law of self-
11 defense was an unreasonable application of clearly-established Supreme Court precedent.").

12 However, even assuming that *Crane* and *Mathews* constitute clearly established Supreme
13 Court authority for purposes of federal habeas review, Cole has failed to demonstrate that the
14 state appellate court's affirmance of his conviction in this case was contrary to, or involved an
15 unreasonable application of, these decisions. As an initial matter, the rule applied by the state
16 appellate court is entirely consistent with *Mathews*: "We begin with the general rule: A
17 defendant is entitled to instruction on request on any defense for which substantial evidence
18 exists." *Cole*, 2006 WL, at *2 (internal quotation marks and citation omitted). Moreover, the
19 state appellate court's application of this rule was not unreasonable. The court opined as follows:

> The circumstances of the shooting in the present case are inconsistent with any fear of imminent harm on the part of appellant. Although appellant and the victim had recently engaged in fisticuffs, that encounter had ended. The victim was walking away, with his back turned, and there was no evidence that appellant was faced with any immediate or imminent threat. The fact that the victim had made a comment that could be interpreted as a threat to engage in a shootout with appellant *at some unspecified later time* did not amount to a threat of *imminent* harm. Most critically, there is no evidence that before appellant began shooting, *appellant* saw or thought he saw any weapon in the victim's possession, or saw or thought he saw that the victim was reaching for any weapon. There was some evidence that the victim may have bent over or reached down around the time of the shooting. Bell testified he thought Young may have been reaching for a gun at this point. However, he also testified that he had seen Young with a gun earlier in the day. If believed, that earlier observation would certainly help to explain *Bell's* belief that Young was reaching for a gun. Yet, there was no evidence that appellant made that earlier observation or knew of it at the time of the shooting. At the time of the shooting, the victim was not running towards or attacking

6

Case No. 5:07-cv-05183-JF
ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS
(JFLC2)

appellant, or anyone else.  In fact, the victim was walking away from him.  We therefore conclude that the requested self-defense instructions were not supported by substantial evidence.

*Id*. (emphasis in original).

Cole argues that the state appellate court ignored evidence that immediately prior to being shot Young had asked, "Do you want to take this to gunplay," and then had reached down.  In fact, the court expressly referenced Young's remark, but it noted that Young made it while walking away, with his back turned to Cole.  The court also noted that although there was evidence that *Bell* had seen Young with a gun earlier, there was no evidence that *Cole* had any knowledge that Young might have had a gun.  Cole argues that the very fact that Young reached down within seconds of threatening "gunplay" was sufficient to instill in Cole a fear of imminent bodily harm, particularly given the previous altercation.  If it were trying the case in the first instance, this Court well might agree that the record contained sufficient evidence to warrant the requested instructions on self-defense.  However, given the state appellate court's detailed explication of its reasoning, this court cannot say that the appellate court's contrary conclusion was an "unreasonable" application of *Mathews* or "an unreasonable determination of the facts in light of the evidence."

## V. ORDER

The petition for writ of habeas corpus is DENIED.  The Clerk shall enter judgment and close the file.

When a district court enters a final order adverse to a state prisoner seeking habeas relief, it must grant or deny a certificate of appealability ("COA") in its ruling.  *See* Rule 11(a), Rules Governing § 2254 Cases, 28 U.S.C. foll. § 2254 (eff. December 1, 2009).  Cole has not shown "that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right [or] that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Accordingly, a COA will be denied.

DATED: 3/31/2011

_____
JEREMY FOGEL
United States District Judge